# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**THOMAS E. WHEELER II**
**MAGGIE L. SMITH**
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**THOMAS W. BLESSING**
Hollingsworth & Zivitz, P.C.
Carmel, Indiana

**IAN THOMPSON**
Frazier Law Firm
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| M.S.D. OF MARTINSVILLE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| REBECCA JACKSON, individually and | ) | No. 55A01-1304-CT-182 |
| As parent and legal guardian of C.J. a | ) | |
| Minor, and KELLI DEARTH, | ) | |
| Individually and as parent and legal | ) | |
| Guardian of B.K., a Minor, | ) | |
| | ) | |
| Appellees-Plaintiffs. | ) | |

APPEAL FROM THE MORGAN SUPERIOR COURT
The Honorable G. Thomas Gray
Cause No. 55D01-1109-CT-1984

**May 19, 2014**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

After Martinsville West Middle School students C.J. and B.K. were injured during a school shooting by former student Michael Phelps ("Phelps"), C.J. and B.K. each filed lawsuits against the Metropolitan School District of Martinsville ("the School District") alleging that the School District breached its duty to keep C.J. and B.K. safe. The School District filed a motion for summary judgment, which the trial court denied.

The School District now appeals the denial of its motion for summary judgment and argues (1) that it is immune from liability pursuant to the Indiana Tort Claims Act, (2) that the School District did not breach its duty to C.J. and B.K., and (3) that C.J. was contributorily negligent.

We affirm.

**Facts and Procedural History**

On March 25, 2011, C.J. was an eighth-grader at Martinsville West Middle School ("MWMS"). C.J. and Phelps, who had also been an eighth-grader at MWMS, were once friends, but their relationship had deteriorated during the preceding few years and had grown particularly antagonistic in 2011 after they both began sporadically dating the same girl, N.A. Phelps remained close with N.A. In the spring of 2011, C.J. allegedly began to spread offensive rumors about N.A., which caused further hostility between C.J. and Phelps. Although the boys had never had a physical altercation at school, Phelps once tried to start a fight with C.J. on a local street after a school basketball game.

During the four years Phelps was enrolled at MWMS,[1] he accumulated a total of fifty discipline referrals, forty-three of which were for disrespect toward school personnel or failure to follow school rules. Phelps also had seven discipline referrals for harassing, threatening, and physically assaulting other students. On March 2, 2011, three weeks before the shooting, Phelps commented to some of his classmates that he wanted to "just blow up the school." Appellant's App. p. 712. After Phelps's classmates reported his remark, the school suspended Phelps for ten days. Phelps remained barred from entering school property except to take the ISTEP test. Because of his overall disciplinary history, the school's principal, Suzie Lipps ("Principal Lipps") also initiated expulsion proceedings against Phelps.[2] However, before Phelps was expelled, and about a week before the shooting, his mother withdrew him from school.

Two days after Phelps made his comment about blowing up the school, on March 4, 2011, while Phelps was on school property to take the ISTEP test, he had an argument with C.J. about N.A. A MWMS teacher overheard the argument and told C.J. "not to feed into it and to walk away." Appellant's App. p. 137. According to C.J., this is the only conversation he had with any school personnel regarding his ongoing problems with Phelps. Around the same time, about two weeks before the shooting, Phelps again threatened C.J. after a school basketball game. C.J.'s girlfriend, A.M., testified that she

[1] Phelps repeated the sixth grade.

[2] Principal Lipps also notified Phelps's probation officer of Phelps's threat. Following a March 2010 incident where Phelps threatened another student, Phelps was adjudicated a delinquent and placed on probation for six months. After Phelps threatened to "blow up" the school, Phelps's probation officer unsuccessfully sought to revoke Phelps's probation.

3

told two MWMS teachers that Phelps had threatened C.J. According to A.M., those teachers did not report Phelps's threats to the school administration.

A.M. also testified that seven days before the shooting, on the afternoon of March 18, 2011, N.A. and A.M. were riding the school bus together when A.M. heard N.A. tell Phelps over the phone that C.J. had made fun of her again. Phelps apparently made yet another threat against C.J. during this conversation. After ending the phone call with Phelps, N.A. told A.M. that "[C.J.] is doomed." Appellant's App. p. 158. A.M. testified that she later warned C.J. of Phelps's threat and C.J. responded, "I'm a big boy." Id. Neither A.M. nor C.J. reported this threat to school personnel.

On the morning of the shooting, March 25, 2011, Phelps's Facebook status read "[t]oday is the day" and "[d]on't use your mind, use your nine." Appellant's App. pp. 562, 751. Phelps arrived at the school around 7:00 a.m. He was wearing a dark-colored hooded sweatshirt with the hood pulled over his head and moved toward the building so as to avoid detection.

Principal Lipps had developed a safety plan for the school[3] and the school's three surveillance cameras, positioned at three of the school entrances, were functioning properly that morning. One of the school's entrances was unlocked from 6:30 a.m. to 7:30 a.m.; two other entrances were unlocked from 7:10 a.m. to 7:30 a.m.; and the five school employees who were assigned to various positions around the school's exterior to monitor student arrival were in place beginning at 7:00 a.m. All of the monitors knew

---

[3] The safety plan also provided for a school anti-bullying policy which requires that anyone who is a victim or witness to bullying report the behavior to the school office. Principal Lipps is responsible for investigating claims of bullying.

4

Phelps and were aware that he was prohibited from being on school property. None of the monitors noticed Phelps when he arrived at the school, although several students did. No students reported Phelps's presence to school personnel, even though "everybody knew" that he was banned from school property and even though the students saw that Phelps carried in his back pocket what appeared to be a wrench covered in a cloth. Appellant's App. pp. 141, 252-53.

Immediately before Phelps approached C.J. that morning, N.A. sought out C.J. in the school's vestibule and told him that Phelps had arrived at the school and planned to "kick [C.J.'s] ass."[4] Appellant's App. pp. 138-39. C.J. replied, "I don't care." Id. at 138. C.J. then sent a text message to his mother to tell her that Phelps wanted to fight him. C.J.'s mother told him via text message to go to the school's office. However, C.J. remained in the school's vestibule because he wanted to show Phelps that he was not afraid of him and because he didn't believe that Phelps would actually assault him. Another MWMS student, B.K., and two other students also remained in the vestibule with C.J.

Phelps entered the school's vestibule and confronted C.J. around 7:15 a.m. He threatened that C.J. "was about to get [expletive] up." Appellant's App. pp. 138-39, 497. Phelps then left the vestibule, only to return a few minutes later. C.J. and B.K. were both still in the vestibule when Phelps arrived. C.J. told Phelps that he did not wish to fight

---

[4] N.A. apparently knew that Phelps possessed a gun, and Phelps had stated to N.A. that he wanted to shoot C.J., but N.A. did not warn C.J. that Phelps had a gun because she did not believe Phelps would really use the gun to attack C.J.

and Phelps responded, "too bad," pulled a stolen handgun[5] from his waistband, and fired two shots into C.J.'s stomach. The ejected shell casings from the bullets hit B.K., injuring his hand. After the shooting, Phelps fled the scene. C.J. was transported via Lifeline to Methodist Hospital in Indianapolis.

The State subsequently charged Phelps with attempted murder, aggravated battery, carrying a handgun without a license on school property, trespassing on school property, possession of a firearm on school property, and theft. The State later dismissed all counts except for the attempted murder count. The juvenile court waived jurisdiction and, following a bench trial on July 11, 2011, Phelps was found guilty of attempted murder. He was sentenced to thirty-five years executed in the Department of Correction, with five years suspended and five years of probation.

On September 20, 2011, approximately six months after the shooting, C.J. and his mother, Rebecca Jackson sued the Martinsville Metropolitan School District, claiming that the School District failed to protect C.J. from Phelps. Specifically, C.J. argued that the School District was negligent when it left Door 2 unlocked, allowing Phelps to enter the school; when it failed to warn personnel monitors that Phelps posed a threat and to instruct them to specifically look for Phelps on school grounds after he was suspended; and when it failed to instruct personnel monitors to call 911 if Phelps was spotted on school property.

Seven months later, on March 22, 2012, B.K.'s mother, Kelli Dearth ("Dearth") filed a similar lawsuit. The trial court consolidated C.J. and B.K.'s complaints. On

---

[5] Phelps apparently stole the handgun from the home of his former stepfather.

January 25, 2013, the School District filed its motion for summary judgment, arguing that it was immune from liability pursuant to the Indiana Tort Claims Act, that C.J. was contributorily negligent, and that the School District did not breach its duty to C.J. and B.K. The parties filed briefs, and the trial court held a hearing on the motion on March 8, 2013. That same day, the trial court issued an order denying the School District's motion for summary judgment.

The School District now appeals.[6][7]

**Standard of Review**

This case comes to us prior to trial, as a result of the trial court's denial of the School District's motion for summary judgment. Our standard of review of summary judgment appeals is well established:

> When reviewing a grant of summary judgment, our standard of review is the same as that of the trial court. Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment as a matter of law." In answering these questions, the reviewing court construes all factual inferences in the non-moving party's favor and resolves all doubts as to the existence of a material issue against the moving party. The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact.

---

[6] B.K. declined to file a separate appellate brief, but instead joined in C.J.'s appellee's brief.

[7] We held oral argument in this appeal on April 26, 2014, at Taylor University in Upland, Indiana. We extend our gratitude to the faculty, staff, and students for their hospitality and commend counsel for the quality of their written and oral advocacy.

Dreaded, Inc. v. St. Paul Guardian Ins. Co., 904 N.E.2d 1267, 1269-70 (Ind. 2009) (citations omitted).

The party appealing a summary judgment decision has the burden of persuading this court that the grant or denial of summary judgment was erroneous. Knoebel v. Clark County Superior Court No. 1, 901 N.E.2d 529, 531-32 (Ind. Ct. App. 2009). Where the facts are undisputed and the issue presented is a pure question of law, we review the matter de novo. Crum v. City of Terre Haute ex rel. Dep't of Redev., 812 N.E.2d 164, 166 (Ind. Ct. App. 2004).

Importantly for this case, summary judgment is rarely appropriate in negligence actions, since negligence cases are particularly fact sensitive and are governed by a standard of the objective reasonable person. This standard is best applied by a jury after hearing all of the evidence. See Kroger Co. v. Plonski, 930 N.E.2d 1 (Ind. 2010).

## I. Indiana Tort Claims Act Discretionary Function Immunity

The School District argues that, because "the challenged actions involve the performance of a discretionary function," it is entitled to immunity under the Indiana Tort Claims Act. Appellant's Br. at 15. The Indiana Tort Claims Act ("ITCA"), Indiana Code section 34-13-2-1 et seq., was enacted after our supreme court abrogated the common law sovereign immunity of governmental units from tort liability. The ITCA governs tort claims against governmental entities and public employees. Harrison v. Veolia Water Indianapolis, LLC, 929 N.E.2d 247, 251 (Ind. Ct. App. 2010). Pursuant to the ITCA, "governmental entities can be subjected to liability for tortious conduct unless the conduct is within an immunity granted by Section 3 of [the] ITCA." Oshinski v. N. Ind.

8

Commuter Transp. Dist., 843 N.E.2d 536, 543-44 (Ind. Ct. App. 2006). The party seeking immunity bears the burden of establishing that its conduct comes within the ITCA. Peavler v. Bd. of Comm'rs of Monroe Cnty., 528 N.E.2d 40, 46 (Ind. 1988).

The ITCA provides that a governmental entity or governmental employee who acts within the scope of that employee's duty will not be liable if a loss results from "[t]he performance of a discretionary function[.]" Ind. Code § 34-13-3-3(7). The party who seeks immunity bears the burden of establishing that its conduct falls within the discretionary function exception.

Prior to our supreme court's decision in Peavler v. Bd. of Comm'rs of Monroe Cnty., we distinguished between ministerial and discretionary acts in order to determine if certain conduct is included within the immunity exception. Discretionary acts were immune and ministerial acts were not. Harvey v. Bd. of Comm'rs of Wabash County, 416 N.E.2d 1296 (Ind. Ct. App. 1981).

Historically, Indiana courts defined a ministerial act as "one which a person performs in a given state of facts in a prescribed manner, in obedience to the mandate of legal authority without regard to, or the exercise of, his own judgment upon the propriety of the act being done." Dep't of Mental Health v. Allen, 427 N.E.2d 2, 4 (Ind. Ct. App. 1981). We classified conduct as discretionary "when it involves [discretion] on the part of the officer to determine whether or not he should perform a certain act, and, if so, in what particular way[.]" Adams v. Schneider, 71 Ind. App. 249, 124 N.E. 718, 720 (1919).

However, in its 1988 decision, Peavler v. Bd. of Comm'rs of Monroe Cnty, our supreme court expressly rejected the ministerial/discretionary distinction analysis,

9

concluding that, unless they can be properly characterized as *policy* decisions that have resulted from a conscious balancing of risks and benefits and/or weighing of priorities, discretionary judgments are not immune from legal challenge under the ITCA. In rejecting the ministerial/discretionary distinction analysis, the supreme court observed that:

> The ministerial/discretionary test does not advance the public policy of government immunity because it does not consider the type of decision protected by immunity. Rather, it considers only the resulting conduct and attempts to label that conduct. The ministerial/discretionary test defines "discretionary" in the negative: anything which is non-ministerial is discretionary. The test does not require an affirmative finding that the governmental action arose from the type of policy-making decision protected by governmental immunity.

Peavler, 528 N.E.2d at 45-46.

The supreme court chose instead to adopt the planning/operational test, defining planning activities as those that "include acts or omissions in the exercise of a legislative, judicial, executive or planning function which involves formulation of basic policy decisions characterized by official judgment or discretion in weighing alternatives and choosing public policy" as well as "[g]overnment decisions about policy formation which involve assessment of competing priorities and a weighing of budgetary considerations or the allocation of scarce resources are also planning activities." Id. at 45.

Under Peavler, then, the discretionary function exception of the ITCA insulates from liability only planning activity, characterized as "only those significant policy and political decisions which cannot be assessed by customary tort standards" and as "the exercise of political power which is held accountable only to the Constitution or the

10

political process." Id. at 45. The supreme court was unambiguous in its declaration that it did not intend all decisions that involve "judgment or discernment" to be immune from liability, since "[i]t would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance." Id. at 43, 45. See also Veolia Water Indianapolis, LLC v. Nat'l Trust Ins. Co., 3 N.E.3d 1 (Ind. 2014) (holding that the City's failure to require for-profit water company to follow terms of management agreement by properly maintaining water supply to fire hydrants was not a discretionary function, and thus, statutory immunity under the ITCA did not protect the city from liability for damages that resulted from a fire that destroyed a restaurant when firefighters' efforts were delayed due to a frozen fire hydrant; the city made no deliberate policy decision to fail to require company to follow the terms of a management agreement by properly maintaining fire hydrants' water supply, or make a conscious decision about policy formation which involved assessment of competing priorities and a weighing of budgetary considerations or the allocation of scarce resources).

The School District contends that the safety plan implemented by Principal Lipps and in place the morning of the shooting "resulted from a conscious balancing of risk and benefits" and thus was entitled to immunity. Id. at 19. An affidavit by Principal Lipps states, in relevant part:

> 6. As the West Principal, I am responsible for all facets of West's operation. I supervise staff, perform staff evaluations, oversee curriculum development and implementation and am responsible for overall student performance and achievement. In many respects, I am the Chief Executive Officer of West.

11

7. Overseeing school operations so that students and staff have safe learning and working environments is also part of my responsibilities as Principal. Thus, I am responsible for the development of a plan for student and staff safety at West.

8. West's Code of Conduct for Students and Discipline Policy is an important part of the safety environment at West. An excerpt from the Student Planner setting forth these provisions is attached. The Anti-Bulling [sic] Policy provides that that [sic] "anyone who is a victim of or a witness to any type of hurtful or aggressive act to an individual student or group of students should immediately report the incident to the office."

9. A school safety plan must balance competing factors and resource limitations that must be considered in providing a learning environment for an educationally diverse student population. A school safety plan must weigh the competing needs of providing a safe environment against the obligation to creating [a] stimulating and open learning environment where students have a reasonable degree of freedom and choices. Because of financial limitations, which have become even more restrictive over the last several years, school administrators throughout the State of Indiana and the M.S.D. Martinsville must constantly prioritize all projects and programs requiring funding to assure that a reasonable balance is struck between educational programming and building security needs.

10. Providing a safe environment for staff and students requires a multi-faceted approach. Prevention of acts of violence, while very important, is not the only concern of a school safety plan. West is a public school and, as such, it must accommodate the needs of students and visitors who, as a practical matter, must have reasonable access [to] the building at various times throughout the school day and at other times for after school activities or other events.

11. With regard to building access, I, as principal, developed a plan that was in place at the time of the shooting in this case and that considered these factors. For example, the M.S.D Martinsville has a system for numbering the exterior doors of each school to guide emergency personnel to the appropriate part of the school in the event of a fire or medical emergency. As Principal, I made certain that each entrance to West has a unique number which is placed above the entrance consistent with the district's numbering system . . . .

12

12. Second, I developed a plan with the assistance of other staff that limited access to the school. All exterior doors . . . were generally locked during the day to prevent access to the building.

13. Staff and students must have reasonable access to the building. Therefore, as part of the school safety plan, I determined that Doors 1, 2, and 3 needed to remain unlocked from 6:30 to 7:30 a.m. when students and staff generally arrived for the school day.

14. To increase student and staff safety, especially during school arrival times when three of the doors are unlocked, I took other steps to reduce the chances of violent incidents. I had cameras installed at all exterior doors that were used by students to enter the building so as to record activity at those doors and to act as a deterrent to misconduct. By recording all activity at these entrances, I believed, based on my experience and training, that the likelihood of violence would be reduced because students and staff would know that their actions by these doors would be preserved for future disciplinary or criminal proceedings. I also determined that based upon the layout of the school building, financial resources, competing building needs, and the utility of additional cameras that the placement and number of cameras was sufficient to provide a safe school environment.

\* \* \*

17. I specifically considered how to place personnel during the mornings to monitor arrivals. One staff member was placed at a location where he or she could observe Door 2 as well as the front of the School….

18. Before the shooting, I participated in regular meetings with the M.S.D. Martinsville's leadership team and the district safety committee. A variety of school safety issues were discussed at these meetings. I, and the assistant principal, frequently re-evaluated West's school safety plan in light of these meetings to determine what improvements or changes should be made to the security at West.

Appellant's App. pp. 94-98 (internal citations omitted).

The School District declares that the decisions made by Principal Lipps with respect to MWMS's safety plan are "quintessential discretionary functions" and argues, "[t]he fact that Plaintiffs may disagree with the ultimate decisions the School made

13

regarding its safety policy does not alter the underlying nature of the School's decision in the first place." Id. at 21, 22.[8]

To support its argument, the School District cites several cases from other jurisdictions concluding that a school's safety and security decisions are discretionary functions which are immune from liability. In Mosley v. Portland School Dist., 843 P.2d 415 (Or. 1992), a high school student who was stabbed with a knife during a fight with another student on school property brought a personal injury claim against the school district and officials, alleging negligence in the school's failure to properly supervise its students, failure to provide adequate security for students, failure to prevent weapons from being brought onto school grounds, and failure to end the fight before the knife was used. The trial court entered judgment against the student. The Oregon Supreme Court affirmed, observing that a "public body that owes a particular duty of care (such as that owed by a school district to its students who are required to be on school premises during school hours) has wide policy discretion in choosing the means by which to carry out that duty." Id. at 419.

The School District also cites Randell v. Tulsa Independent School Dist., 889 P.2d 1264 (Ok. Ct. App. 1994), where a student sued the school district and the school's assistant principal for negligence. The plaintiff had been struck in the face after the assistant principal broke up a fight between the plaintiff and three other students. In his

---

[8] Here, the School District cites Leo Mach. & Tool, Inc. v. Poe Volunteer Fire Dep't, Inc., 936 N.E.2d 855, 862 (Ind. Ct. App. 2010) aff'd on reh'g, 940 N.E.2d 384 (Ind. Ct. App. 2011) (designated evidence that a different course of action would have been better does not alter the immunity analysis as long as the decision being challenged was in fact "undertaken after a conscious and informed risk/benefit analysis").

14

complaint, the plaintiff argued that the school district failed to spend all of the money it had available for security, that it did not have an adequate policy for breaking up crowds or identifying student gang members, that it did not create or enforce policies to report criminal acts of students to police, that it did not have security cameras, and that it failed to act reasonably and prudently. The Court of Appeals of Oklahoma held that the policies created by the school board regarding security were "discretionary acts for which no liability can be imposed." Id. at 1267.

Next, the School District cites Kelly v. Lewis, 471 S.E.2d 583 (Ga. Ct. App. 1996), where the estate of a high school student killed in a shooting sued the school's principal and one of its teachers, arguing that the defendants were aware of the risks of violent crime against the students and failed to use ordinary care to protect the decedent, failed to enforce the school's security rules, and failed to provide adequate security. The Georgia Court of Appeals affirmed the trial court's judgment granting the defendants' motion to dismiss, noting that "'making decisions requiring the means used to supervise school children is a discretionary function of a school principal,'" and that "the teachers' task to monitor, supervise, and control students is a discretionary action protected by the doctrine of official immunity." Id. (quoting Guthrie v. Irons, 211 Ga. App. 502, 506, 439 S.E.2d 732 (1993)). It is important to note, however, that the Georgia court reached its decision using the discretionary/ministerial act analysis expressly rejected by our supreme court in Peavler.

15

Finally, the School District cites Pletan v. Gaines, 494 N.W.2d 38, 44 (Minn. 1992), where the Minnesota Supreme Court held that the school district's district-wide bus-boarding policy entitled the school district to discretionary function immunity.

We first note that C.J.'s complaint does not allege that the MWMS safety plan was negligently *formulated*. Rather, it claims that C.J.'s injury resulted from negligent *implementation* of the plan. See Greathouse v. Armstrong, 616 N.E.2d 364 (Ind. 1993) (under the Peavler planning-operational test, decisions involving formulation of basic policy are entitled to immunity while decisions regarding only execution or implementation of that policy are not). We further note that even if C.J. did allege negligent formulation of the safety plan, MWMS's safety plan was not created in a way that would entitle the School District it to immunity.

In its reply brief, the School District cites two repealed sections of the Indiana Code which provided that "[p]rincipals have the authority to hire, transfer, suspend, lay off, promote, discharge, and discipline school employees," Ind. Code § 20-7.5-1-2(h) (repealed in 2005), and that "[a] principal may take any action concerning the principal's school or a school activity within the principal's jurisdiction that is reasonably necessary to carry out or prevent interference with an educational function or school purposes." Ind. Code § 20-8.1-5.1-5 (repealed in 2005). The School District also quotes Beeching v. Levee, 764 N.E.2d 669, 679 (Ind. Ct. App. 2002), where another panel of this court noted that school principals "have the authority to write regulations governing student conduct" and that "to the general public, a principal is perceived to have responsibility and authority for operating a school and overseeing the education of its students."

16

Importantly for our case, however, the court in <u>Beeching</u> went on to note that

> under Indiana law the only publicly elected, local school officials are school board members. While these elected school board members could easily be determined to be "public officials" because of their elective office, building principals are at least two employment levels removed from school board members. In most, if not all Indiana public school systems, building principals are appointed by system superintendents and ratified by vote of the system's school board.

<u>Beeching</u>, 764 N.E.2d at 679 (internal citations omitted). The <u>Beeching</u> court declared that, under the circumstances of that case, "public school principals are not 'public officials.'" <u>Id</u>. Although this conclusion was made in the context of a defamation action the school principal brought against defendant Beeching, the court's analysis is relevant to the question of whether Principal Lipps's safety plan constituted policy-making immune from liability under the <u>Peavler</u> planning/operation test. Like the principal in <u>Beeching</u>, Principal Lipps had the authority to, and did, write regulations governing the conduct of students at Martinsville West Middle School. Like the principal in <u>Beeching</u>, Principal Lipps stated in her affidavit that she is largely responsible for "all facets of West's operation." Appellant's App. p. 94. However, also like the principal in <u>Beeching</u>, Principal Lipps is not a public official, and her role is not that of policymaker. She is "at least two employment levels removed from [the] school board members" who are elected public officials. <u>Id</u>.

Indeed, language found in Indiana Code Article 20 indicates that a school principal's role is mostly administrative, while the responsibility for creating policy lies with the school board. Indiana Code section 20-18-2-14 provides that "'Principal' refers to the chief *administrative* officer of a school" (emphasis added). And while Indiana

17

Code section 20-33-8-10 states that "[a] principal may take action concerning the principal's school or a school activity within the principal's jurisdiction that is reasonably necessary to carry out or prevent interference with an educational function or school purposes," including "writ[ing] regulations that govern student conduct," Indiana Code section 20-23-16-26 makes clear that it is the school board which "make[s] decisions pertaining to the general conduct of the schools." The statute provides that:

> The government of the common schools of a district is vested in the board. The board shall function with the authority, powers, privileges, duties, and obligations previously granted to or required of school cities and their governing boards regarding the:
> (1) purchase of supplies;
> (2) purchase and sale of:
>      (A) buildings;
>      (B) grounds; and
>      (C) equipment;
> (3) erection of buildings;
> (4) employment and dismissal of school personnel;
> (5) insuring property and employees;
> (6) making and executing of a budget;
> (7) borrowing money; and
> (8) paying the salaries and expenses of the:
>      (A) county superintendent; and
>      (B) employees;
> as approved by the board.

Ind. Code § 20-23-16-26.

The federal District Court for the Southern District of Indiana has held that, in the context of a 42 U.S.C. § 1983 claim brought against a school principal, "the school board and not the Principal . . . has final policy making authority under Indiana law." Harless by Harless v. Darr, 937 F. Supp. 1339, 1349 (S.D. Ind. 1996). In Harless, the court noted

18

Indiana's statutory language[9] allowing school principals to "take any action concerning his school or any school activity within his jurisdiction which is reasonably necessary to carry out or prevent interference with an educational function or school purposes" including "establishing written rules and standards to govern student conduct" but held that this delegation of authority to make "ad hoc decisions" to maintain order within the school was distinguishable from the board's authority to create final policy. Id.

And in Oliver by Hines v. McClung, 919 F. Supp. 1206, 1216 (N.D. Ind. 1995), the District Court for the Northern District of Indiana held that, in a section 1983 action brought by a student against the school principal, "it would appear that while [Principal] McClung and other principals in Indiana were delegated much authority by [Indiana Code section] 20-8.1-5-2, that delegation was not absolute so as to grant principals the power to make final policy for the school boards" and that "while McClung may have had broad discretion to make decisions regarding the operation of the West Jay County Junior High School, nothing in [section] 20-8.1-5-2 purports to grant him policy-making authority."

Under our reading of Indiana case law, Indiana statutes, and the evidence before us, Principal Lipps's safety plan does not entitle the School District to discretionary function immunity under the Indiana Tort Claims Act and the Peavler planning/operation test. Principal Lipps stated in her affidavit, "[a]s the West Principal, I am responsible for

---

9 The court cited Indiana Code section 20-8.1-5-2(b), which has since been replaced with similar language found in Indiana Code section 20-33-8-10(a) ("A principal may take action concerning the principal's school or a school activity within the principal's jurisdiction that is reasonably necessary to carry out or prevent interference with an educational function or school purposes.")

19

all facets of West's *operation*." Appellant's App. p. 94 (emphasis added). And it is apparent that Principal Lipps, a person to whom Indiana law grants no policy-making authority, was largely, if not entirely, the person responsible for developing the MWMS safety plan. Her affidavit provides that "I, as principal, developed a plan that was in place at the time of the shooting in this case and that considered these factors"; that "I determined that Doors 1, 2, and 3 needed to remain unlocked from 6:30 to 7:30 a.m. when students and staff generally arrived for the school day"; that "I had cameras installed at all exterior doors that were used by students to enter the building"; and that "I specifically considered how to place personnel during the mornings to monitor arrivals." Id. at 94-98. Her affidavit indicates that she attended meetings with "the M.S.D. Martinsville's leadership team and the district safety committee" but the leadership team and safety committee apparently had no direct involvement in the development of the Martinsville West Middle School safety plan.[10]

While it may be the case that, in developing the MWMS safety plan, Principal Lipps was required to "balance competing factors and resource limitations that must be considered in providing a learning environment for an educationally diverse student population," Id. at 94, it is important to note that Principal Lipps's development of the plan was not an action mandated by statute under the General Assembly's policy-making authority. Furthermore, unlike the Oregon, Oklahoma, and Minnesota cases cited by the School District, Mosley, Randell, and Pletan, there is no evidence in the record that the

---

[10] Lipps's affidavit provided that "I, and the assistant principal, frequently re-evaluated West's school safety plan in light of these meetings." Appellant's App. pp. 97-98.

elected officials on the school board, the School District's policy-making body, played any role in developing or approving the safety plan. And the Georgia appellate court case, Kelly v. Lewis, has marginal, if any, relevance to our inquiry since it reaches its conclusion using a ministerial/discretionary function analysis that has been considered and rejected by our supreme court.

Peavler dictates that the discretionary function exception under the ITCA grant immunity only to those decisions and actions which constitute "the exercise of political power . . . held accountable only to the Constitution or the political process." Peavler, 528 N.E.2d at 45. Here, we have been directed to nothing to support the School District's contention that Principal Lipps's development of the safety plan was an exercise of political power under Peavler. At best this plan might be immune under the pre-Peavler definition of the word "discretionary," but it is not the type of policy-making that our supreme court has since determined should be exempt from liability under the planning/operation test. As with most discretionary decisions, Principal Lipps may well have balanced factors and resource considerations in developing her plan, but that does not mean that this activity rises to the level of protected policy-making by the school board. Under these facts and circumstances, the School District is not entitled to immunity under the discretionary function exception of the ITCA.

## II. Breach of Duty

The School District next argues that "the School exercised reasonable care for the protection of its students and that it was not foreseeable to the School that [Phelps] would trespass onto school property the morning of March 25th and shoot [C.J.]."

21

Negligence consists of: (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; and (3) injury to the plaintiff proximately caused by that breach. Foddrill v. Crane, 894 N.E.2d 1070, 1075 (Ind. Ct. App. 2008). "An indispensable element of an action for negligence is that the act complained of must be the proximate cause of the accident producing the injury." Havert v. Caldwell, 452 N.E.2d 154, 158 (Ind. 1983). In defining proximate cause, the Indiana Supreme Court has stated that a "negligent act or omission is the proximate cause of an injury if the injury is a natural and probable consequence which, in light of the circumstances, should reasonably have been foreseen or anticipated." Id. Foreseeability of the injury is the critical test for determining the defendant's liability. Nat'l. R.R. Passenger Corp. v. Everton, 655 N.E.2d 360, 366 (Ind. Ct. App. 1995). The foreseeability of whether the defendant's act proximately caused the plaintiff's injuries is a question for the trier of fact. Id. at 366-67.

In cases involving an alleged breach of a school's duty owed to its students, Indiana courts have held that schools have a "special duty," beyond regular premises liability, to exercise the level of care an ordinary, prudent person would exercise under the same or similar circumstances. Swanson v. Wabash College, 504 N.E.2d 327, 330 (Ind. Ct. App. 1987); see also Miller v. Griesel, 261 Ind. 604, 611, 308 N.E.2d 701, 706 (1974) ("[T]he relationship of school pupils and school authorities should call into play the well recognized duty in tort law that persons entrusted with children, or others whose characteristics make it likely that they may do somewhat unreasonable things, have a special responsibility recognized by the common law to supervise their charges.").

22

Because there is "some remote risk of injury in all human existence," <u>Norman v. Turkey Run Cmty. School Corp.</u>, 274 Ind. 310, 316, 411 N.E.2d 614, 617 (1980), the duty imposed upon Indiana schools to protect their students has been necessarily defined by the specific circumstances of each case. Under facts similar to those in the present case, this court has held that a plaintiff has established that a school had a duty to protect its student from criminal attack and breached that duty where the attacker had a propensity towards violence; the school system or school personnel was aware of this propensity; and school personnel's failure to provide adequate supervision allowed the attacker the opportunity to assault the student, proximately causing his injuries. <u>See McClyde v. Archdiocese of Indianapolis</u>, 752 N.E.2d 229, 233 (Ind. Ct. App. 2001). Consequently, we must determine whether genuine issues of material fact exist as to whether the School District conformed to the standard of conduct required by its duty with respect to C.J. <u>See Ashcraft v. Ne. Sullivan Cnty. Sch. Corp.</u>, 706 N.E.2d 1101, 1104 (Ind. Ct. App. 1999).

**A.** *Foreseeability of the Shooting*

The School District argues that summary judgment in its favor is appropriate in this case because the School District could not have foreseen that Phelps would come to the school on March 25, 2011 to shoot C.J. The School District declares that public schools "do not have the luxury of picking and choosing who they can educate" and that, therefore, "school corporations are not and cannot be considered insurers against all risks posed by a student towards others." Appellant's Br. at 32. The School District quotes <u>Roe v. North Adams Community School Corp.</u>, 647 N.E.2d 655, 660 (Ind. Ct. App.

23

1995), where another panel of this court held, "[i]n order for the plaintiffs to recover [against the school district], they were also bound to show that [the other student's] conduct was foreseeable by the school." The School District emphasizes that Phelps's shooting of C.J. was a criminal act by a third party and that the "duty to anticipate and to take steps against a criminal act of a third party arises only when the facts of the particular case make it reasonably foreseeable that a criminal act is likely to occur." Appellant's Br. at 34 (quoting Schlotman v. Taza Cafe, 868 N.E.2d 518, 521 (Ind. Ct. App. 2007)).

In analyzing the foreseeability factor of duty, we focus on whether the injured person actually harmed was a foreseeable victim and whether the type of harm actually inflicted was reasonably foreseeable. Webb v. Jarvis, 575 N.E.2d 992, 997 (Ind. 1991). Such foreseeability does not mean that the precise hazard or exact consequences should have been foreseen, but neither does it encompass anything which might occur. Crull v. Platt, 471 N.E.2d 1211, 1215 (Ind. Ct. App. 1984), reh'g denied, trans. denied. Here, as the moving party, the School District has the burden of demonstrating that, as a matter of law, Phelps's assault on C.J. was not foreseeable. See Kroger Co., 930 N.E.2d at 7.

In this regard, the School District first argues that the affidavit of Phelps's and C.J.'s classmate, C.H., is "insufficient to create a genuine issue of fact" and must be stricken from the record. Appellant's Br. at 25. During a June 28, 2011 deposition taken in criminal proceedings against Phelps, C.H. testified that she did not learn of Phelps's

24

plan to shoot C.J. until she saw Phelps's Facebook status[11] on the morning of March 25, 2011. She also testified that, prior to the shooting, she never notified Principal Lipps that Phelps planned to shoot C.J.[12] However, in a April 30, 2012 affidavit containing the transcript of a recorded statement C.H. made as part of C.J.'s civil proceeding against the School District, C.H. stated that she had learned of Phelps's plan sometime prior to March 25, 2011. In the affidavit, she further stated that, prior to the shooting, she "went to Mrs. Lipps and told her there was going to be a shooting, but [Lipps] said [C.H. was] nothing but a liar . . . she said that in her whole school career she never saw a shooting and she was never going to see one."[13] Appellant's App. p. 39.

The School District requested that the trial court strike the affidavit because "a nonmovant may not create issues of fact by pointing to affidavit testimony which contradicts the witnesses [sic] sworn testimony in a prior deposition." Appellant's Br. at 27 (quoting Miller v. Monsanto Co., 626 N.E.2d 538, 544 (Ind. Ct. App. 1993)). The School District notes that the trial court did not rule on the School District's motion to strike the affidavit. The School District asks that this court "strike the portions of [C.H.'s] Affidavit that contradict her prior deposition testimony." Appellant's Br. at 28.

---

[11] Phelps's status read, "Today is the day" and "Don't use your mind, use your nine." Appellant's App. pp. 750-752.

[12] The following exchange occurred between C.H. and Phelps's defense counsel:

> Q: Did you and [N.A.] and a whole bunch of sixth graders tell Mrs. Lipps that [Phelps] was going to shoot [C.J.]?
>
> A: No. I didn't tell Mrs. Lipps anything.

Appellant's App. pp. 753-54.

[13] Shortly after the shooting, C.H.'s classmate, A.R., made a similar statement to a reporter from local news station Fox 59.

The School District further argues that "[e]ven if not stricken, this Affidavit is insufficient to create a genuine issue of fact as to whether the School had actual knowledge of [Phelps's] threat to shoot [C.J.] prior to the shooting." Id., citing Gaboury v. Ireland Rd. Grace Brethren, Inc., 446 N.E.2d 1310, 1314 (Ind. 1983) ("contradictory testimony contained in an affidavit of the nonmovant may not be used by him to defeat a summary judgment motion").

The School District acknowledges that MWMS teacher Mrs. Kempe overheard an argument between Phelps and C.J. when Phelps was on school grounds to take the ISTEP test and that C.J. subsequently told Mrs. Kempe that Phelps wanted to fight with him. The School District argues, however, that this is "insufficient to establish that the School should have known that [Phelps] intended to harm [C.J.] the morning of March 25," emphasizing that the conversation between C.J. and Kempe occurred three weeks prior to the shooting. Appellant's Br. at 24. The School District also underscores that, prior to the shooting, Phelps had been withdrawn from school by his mother; that Phelps and C.J. had never been involved in a physical altercation with each other at school; that Phelps had never been involved in physical violence at school beyond fist fights; and that even the juvenile court did not consider Phelps to be enough of a danger to others to revoke his probation after he commented that he wanted to blow up the school. Appellant's Br. at 29.

It is well settled that summary judgment is especially inappropriate where the critical question for resolution is whether a defendant exercised the requisite degree of care under the factual circumstances. Randolph Co. Hospital v. Livingston, 650 N.E.2d

26

1215, 1217 (Ind. Ct. App. 1995), trans. denied. Under the facts and circumstances before us in the record prior to trial, we conclude that there exist genuine issues of material fact on this issue and that the School District has not proved as a matter of law that the shooting was not foreseeable. Phelps had a lengthy history of serious misbehavior in school; threatened to blow up the school; and was on school grounds, presumably in close proximity to the personnel monitors, for thirty minutes prior to the shooting. He had made threats against C.J., of which at least one MWMS teacher was aware. The day before the shooting, another MWMS student had made a threat to shoot a teacher. Given these facts, a jury could conclude that it is foreseeable that a shooting would occur at MWMS. The unstricken affidavit of C.H. also creates genuine issues of material facts as to whether the School District had specific warning about Phelps's attack. See McClyde, 752 N.E.2d at 235 (concluding that an affidavit relied on exclusively by plaintiff can be sufficient to create genuine issues of material fact precluding grant of defendant's motion for summary judgment).

We further note that the School District's argument regarding the affidavit containing C.H.'s recorded statement is misguided. The principles the School District cites do not apply to the use of C.H.'s affidavit. While it is true that our courts have held that "contradictory testimony contained in an affidavit of the nonmovant may not be used by him to defeat a summary judgment motion where the only issue of fact raised by the affidavit is the credibility of the affiant," Gaboury v. Ireland Rd. Grace Brethren, Inc., 446 N.E.2d 1310, 1314 (Ind. 1983), the stated purpose for this rule is to "prevent *a party* from generating its own genuine issue of material fact by providing self-serving

27

contradictory statements without explanation." Crawfordsville Square, LLC. v. Monroe Guar. Ins. Co., 906 N.E.2d 934, 939 (Ind. Ct. App. 2009) (emphasis added). Here, it is the deposition and affidavit of a *non-party* witness that allegedly conflict. Furthermore, the deposition with which C.H.'s affidavit allegedly conflicts occurred within a different case altogether, Phelps's criminal proceeding. Therefore, it is not likely the case that C.H. made contradictory statements in a self-serving attempt to avoid a damaging admission she made in a deposition in a separate proceeding.

Under these facts and circumstances, we conclude that the question of whether the shooting was foreseeable to the School District is one that is best resolved by the trier of fact rather than through summary judgment.

## B. *Implementation of Safety Plan*

The School District next contends that it exercised reasonable care in providing for the safety of its students, noting that Principal Lipps had implemented (1) a school-wide policy prohibiting threats, bullying, and fighting; (2) a door numbering system; (3) an electronic door locking system; (4) a video surveillance system; and (5) the placement of personnel monitors around school grounds during the time in which students arrived in the morning. The School District further emphasizes that when Phelps threatened to "blow up the school," he was suspended immediately and expulsion proceedings were initiated. The School District declares, "there is no scenario whereby a school can go into the type of extended lockdown requested by Plaintiffs every time two students are threatening to fight each other—occurrences that law enforcement in this case described as 'typical' among adolescent boys." Appellant's Br. at 33.

28

Given the unresolved question of whether the shooting was foreseeable, it follows that there remains this question: if the School District knew or should have known that Phelps posed a threat to C.J.'s safety, should it have taken more steps to protect C.J. from Phelps? A recent opinion by another panel of this court, Prancik v. Oak Hill United Sch. Corp., 997 N.E.2d 401 (Ind. Ct. App. 2013) trans. denied, involves facts that are somewhat similar to the facts of this case, but can be distinguished in two important ways. There, a junior high school teacher left two students unsupervised in her classroom during a four-minute passing period to supervise the hallway. While the teacher was in the hallway, one of the students assaulted the other, injuring him. This court affirmed the trial court's grant of the school's motion for summary judgment, concluding that the school was not negligent for failing to prevent the attack since there was no evidence that the school was on notice that the attacker could be violent and no evidence that the assault happened as a result of any failure by the teacher to follow school protocol.

Viewing the facts liberally in a light most favorable to C.J., as our standard of review requires, it seems to us that reasonable persons could differ as to whether there is a sufficient relationship between the School District's general duty to supervise and protect its students and its alleged failure to take adequate measures to protect C.J. from Phelps. There exist genuine issues of material fact here, in light of the continued conflict between the two boys, Phelps's extensive disciplinary history, including discipline referrals for harassing, threatening, and assaulting other students, and Phelps's threat to blow up the school. Therefore, this issue is more appropriately a question for the trier of fact. See Drake by Drake v. Mitchell Cmty. Sch., 628 N.E.2d 1231, 1234-35 (Ind. Ct.

29

App. 1994) aff'd in part, vacated in part on other grounds (holding that summary judgment was inappropriate where a reasonable jury could have found that a school hosting a social event inside a grain elevator "breached its duty to exercise reasonable care to warn the students and/or protect them from a known danger, exposure to histoplasmosis" resulting from pigeon droppings inside the elevator).

### III. C.J.'s Contributory Negligence

The School District next argues that summary judgment in its favor is required because C.J. was contributorily negligent "in failing to follow his mother's directions to leave the vestibule and go to the office and report the threats." Appellant's Br. at 36.

"Contributory negligence" is the failure of a plaintiff to exercise the reasonable care an ordinary person would use for his own protection and safety. Funston v. Sch. Town of Munster, 849 N.E.2d 595, 598 (Ind. 2006). In 1985, Indiana largely put to rest its common law defense of contributory negligence "that barred recovery on a plaintiff's negligence claim if the plaintiff was even slightly at fault." Penn Harris Madison Sch. Corp. v. Howard, 861 N.E.2d 1190, 1193 (Ind. 2007). In its place, Indiana's Comparative Fault Act created a modified comparative fault scheme whereby "'any contributory fault chargeable to the claimant diminishes proportionately the amount awarded as compensatory damages . . . .'" Hopper v. Carey, 716 N.E.2d 566, 575 (Ind. Ct. App. 1999), trans. denied (quoting Ind. Code § 34-51-2-5). But "the claimant is barred from recovery if the claimant's contributory fault is greater than the fault of all persons whose fault proximately contributed to the claimant's damages." Ind. Code § 34-51-2-6.

However, the legislature specifically provided that the new comparative fault scheme would not apply to governmental entities. See Ind. Code § 34-51-2-2. "This exemption for governmental entities from comparative fault means that the common law contributory negligence principles apply when a governmental entity is the defendant in negligence litigation." Penn Harris Madison Sch. Corp. v. Howard, 861 N.E.2d 1190, 1193 (Ind. 2007). And "Indiana law requires that contributory negligence on the part of the plaintiff bars any recovery against government actors." Clay City Consol. Sch. Corp. v. Timberman, 918 N.E.2d 292, 300 n. 6 (Ind. 2009).

Since the School District is a governmental entity, if C.J. were found to be contributorily negligent, he would be barred from recovery. Roddel v. Town of Flora, 580 N.E.2d 255, 259 (Ind. Ct. App. 1991). The general rule on the issue of the plaintiff's contributory negligence is that the plaintiff must exercise that degree of care to protect his or her own safety that an ordinary reasonable person would exercise in like or similar circumstances. Sawlani v. Mills, 830 N.E.2d 932, 941 (Ind. Ct. App. 2005), trans. denied. Contributory negligence is conduct on the part of the plaintiff that contributes as a legal cause to the harm he has suffered and falls below the standard to which he is required to conform for his own protection. Piatek v. Beale, 994 N.E.2d 1140, 1147-48 (Ind. Ct. App. 2013) aff'd on reh'g, trans. denied.

Contributory negligence is generally a question of fact for the jury where the facts are subject to more than one reasonable inference. Jones v. Gleim, 468 N.E.2d 205, 207 (Ind. 1984). However, where the facts are undisputed and only a single inference can reasonably be drawn therefrom, the question of contributory negligence becomes one of

31

law.  Id.  Indiana courts have found contributory negligence as a matter of law in cases in which the voluntary conduct of the plaintiff exposed him to imminent and obvious dangers which a reasonable man exercising due care for his own safety would have avoided.  Id.

The School District claims that C.J. "had actual knowledge of the specific risk of an imminent attack from [Phelps] that could result in serious injury or even death." Appellant's Br. at 41.  The School District emphasizes that:

> [Phelps] had previously threatened [C.J.] with a chain outside school grounds. A student of [C.J.'s] age could appreciate the risk of serious injury that could result from [Phelps's] use of such a weapon. Further, as discussed in the preceding subsection, [C.J.] himself has admitted that he had actual knowledge and appreciation of the specific risk that [Phelps] presented with the threats to "kick his ass" and that he ''was about to get [expletive] up."
>
> Nevertheless [C.J.] chose to stay in the vestibule and wait for [Phelps] to come back, despite being told by his mother to leave and go to the office.

Id.

For the trial court to have ruled that contributory negligence was present as a matter of law, "the evidence would have had to overwhelmingly establish, and without grounds upon which reasonable men may disagree," that C.J. was able to realize and appreciate the danger with which he was confronted.  Dibortolo v. Metro. Sch. Dist. of Washington Twp., 440 N.E.2d 506, 512 (Ind. Ct. App. 1982).  The School District has laboriously argued that Phelps's shooting of C.J. was unforeseeable to the School District, yet it claims that C.J. should have foreseen that he would be vulnerable to a shooting

when he decided to remain in the vestibule in which Phelps confronted C.J.  This is precisely the type of genuine issue of material fact that should be resolved by a jury.

Moreover, in a society where bullying is a pervasive and confusing problem, especially among young, school-aged children, we question whether the issue of contributory negligence can be properly resolved as a matter of law, especially when, as here, a victim is not the initial aggressor in an altercation, but merely fails to meekly walk away from an attacker who is violently disposed, and especially where the victim appears to have been unaware that the attacker was armed.  Because the issue of contributory negligence is generally not appropriate for summary judgment and because, in the present case, the facts are subject to more than one reasonable inference, we conclude that the trial court did not err in finding that the issue of C.J.'s contributory negligence is most appropriately a matter for the jury.  See Randolph Co. Hospital, 650 N.E.2d at 1217; Maldonado by Maldonado v. Gill, 502 N.E.2d 1371, 1373 (Ind. Ct. App. 1987); see also Stowers v. Clinton Cent. Sch. Corp., 855 N.E.2d 739 (Ind. Ct. App. 2006) (holding that material issues of fact exist as to whether a high school student football player was contributorily negligent, as a matter of law, and whether the student had actual knowledge of the specific risk and incurred the risk, thus precluding grant of summary judgment to school on wrongful death claim brought by parents of  the student, who collapsed due to heat related problems after summer football practice and later died).

## IV. Conclusion

For all of these reasons, we conclude that the trial court's denial of the School District's motion for summary judgment was proper.  The School District has not met its

burden of showing that it is entitled to discretionary function immunity under the ITCA, since C.J. and B.K. challenge the implementation rather than formulation of the safety plan, and since the safety plan was not the result of the type of policy decision-making protected by the statute. Furthermore, there exist genuine issues of material fact as to whether the School District breached its duty to protect C.J. and B.K. and whether C.J. was contributorily negligent in a manner which proximately caused his injuries.

Affirmed.

ROBB, J., and BRADFORD, J., concur.