## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 20 2016, 10:35 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEYS FOR APPELLANT | ATTORNEY FOR APPELLEE |
|---|---|
| Thomas F. Bedsole | F. Anthony Paganelli |
| Maggie L. Smith | Paganelli Law Group |
| Frost Brown Todd, LLC | Indianapolis, Indiana |
| Indianapolis, Indiana | |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| 2007 East Meadows, LP, | January 20, 2016 |
| *Appellant-Defendant/Counterclaim Plaintiff,* | Court of Appeals Case No. 49A05-1407-PL-300 |
| v. | Appeal from the Marion Superior Court |
| RCM Phoenix Partners, LLC, | The Honorable James B. Osborn, Judge |
| *Appellee-Plaintiff/Counterclaim Defendant* | Trial Court Cause No. 49D14-0807-PL-34494 |

**Mathias, Judge.**

[1] 2007 East Meadows, LP ("Meadows") appeals from the order of the Marion Superior Court granting summary judgment in favor of RCM Phoenix Partners, LLC ("Phoenix") in Meadows's counter-claim against Phoenix alleging breach

of contract and fraud and requesting specific performance. On appeal, Meadows presents four issues, which we restate as whether the trial court properly granted summary judgment in favor of Phoenix on Meadows' claims of breach of contract and fraud and its request for specific performance.

[2] We affirm.

## Statement of Facts

[3] Phoenix is a Connecticut-based company that owns the Phoenix Apartments ("the Apartments"), a housing complex in Indianapolis.[1] The Apartments are located in a depressed and economically distressed area and serve to house poorer residents through the U.S. Department of Housing and Urban Development ("HUD"). HUD paid Phoenix a monthly "Housing Assistance Payment" ("HAP") pursuant to an agreement between HUD and Phoenix.

[4] In July of 2007, Phoenix entered into a written Purchase and Sale Agreement ("the Agreement") with Texas-based Eureka Holdings Acquisitions, LP ("Eureka"), in which Eureka agreed to purchase the Apartments for a price of $9,050,000. Three months later, on September 5, 2007, Eureka assigned all of its rights under the Agreement to Indiana-based Meadows.

[5] The Agreement contained at least three essential requirements: (1) that HUD approve assigning the HAP to Meadows; (2) Meadows tendering a cash

---

[1] The apartments are located south of 42nd Street, in the area between North Keystone Avenue and North Sherman Drive, east of the State Fairgrounds.

payment at closing; and (3) Meadows assuming roughly $6,850,000 of Phoenix's loan and mortgage obligations ("the Mortgage") with Wachovia Bank ("Wachovia"). Thus, the contract required Meadows to pay the purchase price through a combination of cash and assuming the existing multi-million dollar Wachovia mortgage. Meadows had secured the cash required for closing and presumed that Wachovia's approval of the assignment of the Mortgage would be a "formality" because the loan was secured by both the real property and the HUD Housing Assistance Payment.

[6] The Agreement called for a closing date in October 2007. However, as of October 1, 2007, Wachovia had not yet approved Meadows to assume the Mortgage. Accordingly, Meadows' counsel sent an email to Phoenix's counsel invoking a provision of the Agreement that allowed the closing date to be extended by thirty days if the lender had not yet approved assumption of the Mortgage. The closing date was then set for late in November 2007. However, by late October, Meadows had still not received approval and became concerned that the approval process was taking too long. In an email sent on October 31, 2007, Meadows indicated that it might need another extension of the closing date to secure the approval from Wachovia. On November 19, 2007, Phoenix's counsel sent a letter to Meadows's counsel complaining about the delays in securing financing and threatening to cancel the transaction. The following day, Meadows requested another extension of the closing date, and the parties eventually agreed to amend the Agreement, with the closing date

changed to be "on or before January 7, 2008. TIME BEING OF THE ESSENCE." Appellant's App. p. 128.

[7]    Meadows was still having trouble obtaining Wachovia's approval of the mortgage assumption, and on November 28, 2007, Meadows' chief financial officer Mike Wallis ("Wallis") accused Wachovia in an email of "sitting on its hands" with regard to the mortgage assumption request. In an internal memo on that same date, Wallis informed his colleagues at Meadows that Wachovia had all of the information it needed to approve the loan, yet Wachovia was not even willing to send Meadows the draft loan documents for Meadows' counsel to review.

[8]    Tragically, at some point in November 2007, a three-year-old child was killed by her parents in one of the units at the Apartments.[2] This incident caused a public outcry, and on December 5, 2007, the Indianapolis Housing Authority began an enforcement action[3] against Phoenix regarding the condition of the Apartments. The enforcement action sought "[r]ecovery of Federal Funds due to the allegations of civil and/or criminal fraud," "[h]ousing fraud due to a number of reasons, including alleged poor housing conditions, failure to disclose ownership change, and violations of the HAP agreement." Appellant's App. p. 215. The action sought changes in the management and operation of

---

[2] No evidence indicates that this incident had any connection with Phoenix.

[3] Meadows insists upon referring to the enforcement action as a "criminal" action, whereas Phoenix contends that it was merely a "civil" enforcement action.

the Apartments in addition to recovery of governmental funds the Apartments had received. *Id.*

[9] One of the key points of contention in the present case is whether Phoenix notified Meadows of this incident. Phoenix claims, and the trial court found, that Phoenix did notify Meadows regarding the child's death and the subsequent enforcement action. Meadows, however, designated some evidence that it learned of the enforcement action as it was making the final preparations for closing.

[10] Meadows also designated evidence indicating that, prior to the closing date, HUD informed it that it would not approve of the transfer of the HAP because of the enforcement action against Phoenix.[4] Meadows also designated evidence indicating that it could not obtain Wachovia's approval without HUD agreeing to transfer the Housing Assistance Payment.

[11] By December 7, 2007, Wachovia had still not approved of Meadows's request to assume the mortgage on the Apartments. Even so, that same day, Meadows's counsel emailed Phoenix's counsel informing him that Meadows hoped to have the approval documents soon. However, approval was not forthcoming, and on the scheduled closing date, January 7, 2008, Meadows' counsel asked Phoenix for another thirty-day extension of the closing date.

---

[4] Correspondence between HUD and Block indicated that HUD failed to approve of the HAP transfer because HUD had concerns regarding the conditions at another property in Texas with which Meadows was involved. *See* Appellant's App. pp. 314-16.

Phoenix declined to agree to an extension. Later that day, Meadows' counsel announced that Meadows was not going to close on the agreement, giving the enforcement action as the reason. Despite the fact that it had not secured Wachovia's approval, Meadows asserted that it was ready, willing, and able to close but claimed that Phoenix was in breach of the contract because of the enforcement action.

## Procedural History

[12]  Meadows initially brought suit against Phoenix in Texas on January 22, 2008. In its suit, Meadows claimed breach of contract and fraud and sought a declaratory judgment, constructive trust, and specific performance. The Texas trial court dismissed the action for lack of personal jurisdiction over Phoenix, and Meadows appealed. While the appeal was pending, Phoenix filed suit in Indiana (in Marion Circuit Court) on July 31, 2008, seeking a declaratory judgment that Meadows' allegations of breach of contract and fraud were meritless. Because the parties were in settlement negotiations, they both requested on October 10, 2008, that the Indiana action be stayed, which request the trial court granted. On April 14, 2010, the Texas Court of Appeals affirmed the Texas trial court's decision that it had no personal jurisdiction over Phoenix. *See 2007 East Meadows, L.P. v. RCM Phoenix Partners, L.L.C.*, 310 S.W.3d 199 (Tex. App. 2010), *reh'g overruled, review denied*.

[13]  On July 27, 2011, Meadows filed a motion asking that the stay in the Indiana case be lifted. The trial court granted this motion, and Meadows subsequently filed a counter-claim asserting the claims it had originally brought in the Texas

case. After lengthy pre-trial discovery, the trial court set a trial date of July 14, 2014.

[14] In the meantime, on February 6, 2014, Phoenix entered into an agreement to sell the Apartments to the Meadows Community Foundation[5] ("the Foundation") for $10,481,611. Accordingly, Phoenix moved to advance the trial date to May 2014 to facilitate its selling of the Apartments to the Foundation. The trial court denied this request. Then, on March 31, 2014, both parties moved for summary judgment. Meadows sought partial summary judgment in its favor on the claims of breach of contract and specific performance. Phoenix sought partial summary judgment on the issues of breach of contract and fraud. Subsequently, the Foundation sought leave to intervene in the action.[6] Over Meadows' objection, the trial court granted the motion. On June 16, 2014, the trial court held a hearing on the summary judgment motions, and both parties subsequently filed proposed findings and conclusions.

[15] On June 26, the trial court entered findings of fact and conclusions of law granting partial summary judgment in favor of Phoenix. Meadows filed a notice of appeal on July 7, 2014, and on July 17, 2014, Phoenix filed a motion in this Court seeking to expedite Meadows' appeal. On July 25, 2014, Meadows filed a

---

[5] The Foundation appears to be a completely separate entity from Meadows.

[6] Phoenix's agreement to sell the property to the Foundation also later fell through. *See* Appellant's App. pp. 516-18 (stating in motion that "counsel for the [Foundation] represented to and notified East Meadows that the purchase agreement for the Property has been terminated, and that there is no planned purchase and sale transaction at this time.").

motion to correct error in the trial court. On August 14, 2014, Meadows filed a motion in this Court to remand the case to the trial court for consideration of its motion to correct error. We granted this request on September 17, 2014, and this case was remanded so that the trial court could rule on Meadows' motion to correct error. After a hearing held on October 9, 2014, the trial court denied Meadows' motion to correct error the next day. Meadows now appeals.

## Standard of Review

Our standard for reviewing a trial court's order granting a motion for summary judgment is well settled:

> A trial court should grant a motion for summary judgment only when the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The trial court's grant of a motion for summary judgment comes to us cloaked with a presumption of validity. An appellate court reviewing a trial court summary judgment ruling likewise construes all facts and reasonable inferences in favor of the non-moving party and determines whether the moving party has shown from the designated evidentiary matter that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. But a de novo standard of review applies where the dispute is one of law rather than fact. We examine only those materials designated to the trial court on the motion for summary judgment. Our standard of review is not altered by the fact that the parties filed cross motions for summary judgment. Here, the trial court made findings of fact and conclusions of law in support of its entry of summary judgment. Although we are not bound by the trial court's findings and conclusions, they aid our review by providing reasons for the trial court's decision. We

must affirm the trial court's entry of summary judgment if it can be sustained on any theory or basis in the record.

*Altevogt v. Brand*, 963 N.E.2d 1146, 1150 (Ind. Ct. App. 2012) (citations and internal quotations omitted).

## I. Meadows' Inability to Perform

[17] Meadows first contends that it was entitled to summary judgment on the issue of whether Phoenix breached the Agreement. Meadows notes that Phoenix had several obligations under the Agreement, including: not engaging in any activity or transaction with respect to the Property that is outside the normal and ordinary course of business; operating the Property in the same manner as its operation prior to the Agreement; turning over the Property in substantially the same condition; and not entering into any new contracts affecting the Property without the consent of Meadows. Phoenix also warranted in the Agreement that no civil, administrative, or other actions, suits, or proceedings were pending or threatened against or affecting the Property.

[18] Meadows claims that by becoming embroiled in the enforcement action and negotiating a settlement agreement with the Indianapolis Housing Authority to resolve the enforcement action, Phoenix breached these terms of the Agreement. Phoenix claims that it did not breach the Agreement, but it also argues that Meadows cannot now seek to enforce the Agreement because Meadows was unable to perform its own obligations under the Agreement.

Thus, the first question we address is whether Meadows was, in fact, able to perform.

## A. Meadows' Ability to Perform

Meadows asserts that it was ready, willing, and able to perform its obligations under the Agreement.[7] Meadows strongly contests the position of Phoenix and the trial court that Meadows itself breached the Agreement by not being able to obtain Wachovia's approval to assume the mortgage obligations. Meadows denies that not obtaining the Bank's approval was the reason it did not close on the Agreement; it instead claims that the only reason it did not close was the existence of the enforcement action which prevented Meadows from obtaining the required approvals and excused it from closing due to the changed conditions in the property. This is where Meadows' recitation of the facts becomes, at best, selective.

Meadows correctly notes that performance of the Agreement required three things: (1) that Meadows tender a cash payment at closing; (2) that HUD approve the assignment of the HAP to Meadows; and (3) that Meadows assume

---

[7] Meadows also claims that the trial court erred in concluding that it could not seek specific performance and also recover monetary damages. We agree. Granting specific performance does not preclude a monetary award. *Estate of Collins v. McKinney*, 936 N.E.2d 252, 260-61 (Ind. Ct. App. 2010). Although a grant of specific performance precludes "legal damages," it does not necessarily preclude a monetary award. *See Kesler*, 792 N.E.2d at 897 (noting that the compensation awarded as incident to specific performance are not for breach of contract and therefore not "legal damages," and are instead awarded to adjust the rights of the parties and equalize any losses occasioned by the delay by offsetting them with money payments). Therefore, Meadows is correct that, in addition to specific performance, it may also seek monetary damages if such damages are necessary under the circumstances. However, we conclude *infra* that Meadows is not entitled to specific performance.

roughly $6,850,000 of Phoenix's loan and mortgage obligations with Wachovia. We focus our analysis on the third obligation.

[21] In portions of its brief, Meadows appears to claim that it did secure such approval. For example, Meadows' brief includes a heading which states, "*Seller's Bank had approved Purchaser's assumption of Seller's loan* and was prepared to close on the sale by January 7, 2008." Appellant's Br. p. 24 (emphasis added). Meadows also writes in its brief, "After the Contract was amended and a new closing date was established, Purchaser continued working with Seller's Bank to obtain approval for the assumption of Seller's mortgage. *These efforts were successful* and, on December 7, 2007, Purchaser reported to Seller that Seller's Bank had declared it was preparing to close on the sale by December 14, 2007." *Id.* (emphasis added).

[22] However, these assertions are not supported by the record. To support its claim that its efforts to assume the mortgage were successful, Meadows refers to page 308 of its Appendix, but this page contains a copy of an email sent from Meadow's agent, Harris Block ("Block") in which he stated:

> Wachovia's counsel told me yesterday afternoon that they hope to have documents out by the end of the day today [December 7, 2007]. They also anticipate having a conference call, with you and me, sometime early next week. While I believe it is aggressive, they said they hope to be ready to close by next Friday, Dec. 14. In my own opinion, I think that a closing by Friday, Dec. 21 is more realistic and likely.

Appellant's App. p. 308 (emphasis added). This email does not state that Wachovia had approved the mortgage assumption. It merely expresses Block's hopes and beliefs that such approval was forthcoming.

[23] Moreover, after clearly stating in its brief that the efforts to assume the mortgage "were successful," Meadows then admits to the exact opposite one sentence later, stating, "there is abundant evidence that the lender approval *did not exist as of the January 7, 2008 closing date*."[8] Appellant's Br. p. 25. The designated evidence clearly indicates that Wachovia had not approved of the mortgage assumption as of the January 7, 2008 closing date.[9]

[24] Thus, despite Meadows' reliance on the letter it sent to Phoenix on the closing date stating that Meadows was "ready, willing, and able" to close on the Agreement, the fact remains that Meadows was not able to close on the Agreement because it had yet to secure Wachovia's approval of the mortgage assumption. In other words, the fact that Meadows *claimed* to be ready, willing, and able to close is not evidence that it was *actually* ready, willing, and able to perform. Without approval to assume the mortgage, Meadows was unable to

---

[8] Although Meadows admits in this sentence that Wachovia's approval had not been secured by the January 7, 2008, closing date, it claims that this was "because of [Phoenix]'s actions or omissions." *Id*. However, Meadows never explains precisely how Phoenix is at fault for Wachovia's failure to approve the loan assumption. Although it plays no part in our decision, it is not surprising that Meadows ran into obstacles in obtaining approval of the mortgage assumption given the well-known mortgage crisis that was occurring at the time. In fact, Wachovia did not survive the mortgage crisis and was acquired by Wells Fargo. *See* http://www.federalreserve.gov/newsevents/press/orders/20081012a.htm.

[9] The record indicates that Meadows did not gain approval to assume the mortgage until February 22, 2010, when it received an approval letter from Wells Fargo.

perform the Agreement. However, what are the consequences of this inability to perform?

*B. Specific Performance*

[25] Because Meadows was unable to perform, it is not entitled to specific performance of the Agreement. Specific performance is an equitable remedy. *Kesler v. Marshall*, 792 N.E.2d 893, 896 (Ind. Ct. App. 2003), *trans. denied*. When dealing with contracts for the purchase of real estate, Indiana courts routinely order specific performance because "each piece of real estate is considered unique, without an identical counterpart anywhere else in the world." *Id*. Still, the power of a court to order the equitable remedy of specific performance is an extraordinary power that is not available to a party as a matter of right. *Id*. Courts should not exercise equitable powers when there is an adequate remedy at law. *Id*. at 897.

[26] It is well established that a party seeking specific performance of a real estate contract must prove that he has substantially performed his contractual obligations or offered to do so. *Salin Bank & Trust Co. v. Violet U. Peden Trust*, 715 N.E.2d 1003, 1007 (Ind. Ct. App. 1999). Because Meadows was unable to perform the Agreement as of the January 7, 2008, closing date, it was not entitled

to specific performance.[10] *See id.* Accordingly, the trial court properly granted summary judgment denying Meadows' claim for specific performance.[11]

## C. Damages for Breach of Contract

[27] Phoenix claims that, because Meadows was unable to perform, Meadows cannot seek to enforce the Agreement at all. In support of this argument, Phoenix cites *Melton v. Coffelt*, 59 Ind. 310 (1877). In that case, the court held that, in an action based on a mutual agreement of the parties, "the party pleading the same must aver performance, or a sufficient excuse for non-performance, of the stipulations of the agreement on his part performed, or the pleading will be held insufficient on a demurrer thereto[.]" *Id*. at 314. Meadows

---

[10] Because Meadows was not entitled to specific performance, we do not address Phoenix's argument that Meadows' request for specific performance is barred by the equitable doctrine of laches.

[11] The parties also argue at length regarding HUD's failure to approve the transfer of the HAP to Meadows. Meadows lays the blame for this failure on Phoenix. Phoenix claims that the evidence Meadows designated in support of this claim was inadmissible hearsay. Specifically, Block testified during deposition that "[HUD] indicated that because of the action at the property they were going to have to delay the final approval [of the HAP transfer]." Appellant's App. at 235. Phoenix claims that this is inadmissible hearsay that cannot be relied upon in summary judgment proceedings. *See Breining v. Harkness*, 872 N.E.2d 155, 158 (Ind. Ct. App. 2007) ("Inadmissible hearsay contained in an affidavit may not be considered in ruling on a summary judgment motion."). We agree with Phoenix that Block's testimony regarding what HUD told him was hearsay—out-of-court statements offered to prove the truth of the matter of what was asserted in the statements, i.e., that HUD delayed approval of the HAP transfer because of the enforcement action involving the Apartments.

Meadows notes, however, that this rule prohibiting the consideration of hearsay on summary judgment was modified by our supreme court in *Reeder v. Harper*, 788 N.E.2d 1236 (Ind. 2003). In *Reeder*, the court held that "an affidavit that would be inadmissible at trial may be considered at the summary judgment stage of the proceedings if the substance of the affidavit would be admissible in another form at trial." *Id*. at 2141-42. Thus, Block's hearsay testimony could be considered on summary judgment if the substance of the statement would be admissible in another form at trial. However, we need not resolve this issue. Regardless of the reason for HUD's failure to approve the HAP transfer by the closing date, the fact remains that Meadows was unable to perform on the closing date because of Wachovia's failure to approve the mortgage assumption. The trial court properly denied Meadows' request for specific performance for this reason alone.

does not directly deny the validity of this case, and indeed, the general rule appears to be that "[a] party who seeks to recover damages from another party for breach of contract must show himself or herself free from fault in respect to performance, and a party cannot recover on a contract without showing that he or she performed his or her responsibilities thereunder." 17B C.J.S. Contracts § 664 (2015). As explained in detail above, Meadows was unable to perform under the Agreement due to the failure to secure Wachovia's approval of the loan assignment. Accordingly, the trial court properly granted summary judgment in favor of Phoenix on Meadows' claim of breach of contract.

## II. Did Phoenix Commit Fraud?

[28] Lastly, we address Meadows' claim that a genuine issue of material fact exists regarding whether Phoenix committed fraud by failing to disclose the existence of the enforcement action to Meadows.

[29] The tort of fraud consists of: (1) material misrepresentation of past or existing facts by the party to be charged, (2) which was false, (3) which was made with knowledge or reckless ignorance of the falseness, (4) was relied upon by the complaining party, and (5) proximately caused the complaining party injury. *Johnson v. Wysocki*, 990 N.E.2d 456, 460-61 (Ind. 2013).[12] Here, the parties

---

[12] *Johnson* was superseded by statute on other grounds as noted in *Hays v. Wise*, 19 N.E.3d 358 (Ind. Ct. App. 2014).

dispute only whether Phoenix informed Meadows of the enforcement action initiated by the Indianapolis Housing Authority.

[30] In support of its position, Phoenix designated the deposition testimony of its agent, Paul Morris ("Morris"), in which he testified that he told Meadows' agent Block about the enforcement action in December 2007. *See* Appellant's App. pp. 319-20. This is sufficient for Phoenix to meet its burden of making a prima facie showing no genuine issue of material fact exists with regard to this issue. *See M.S.D. of Martinsville v. Jackson*, 9 N.E.3d 230, 235 (Ind. Ct. App. 2014) (noting that the party moving for summary judgment bears the burden of making a prima facie showing that there are no genuine issues of material fact), *trans. denied*. The burden then shifted to Meadows to demonstrate the existence of a genuine issue of material fact. *See id*.

[31] Here, Meadows designated portions of Block's deposition testimony in which he claimed that the action was not disclosed. Appellant's App. p. 330 ("[T]he contract stipulated that any actions, government actions have to be disclosed to the buyer. It was not disclosed."); *Id*. at 331 ("[T]hey did not tell us during the pendency of the contract until we found out from other sources.").

[32] However, Block's deposition testimony was not entirely unambiguous. When pressed, Block back-pedaled from his earlier testimony and testified that he could not say that anyone from Phoenix lied to him about the enforcement action. Moreover, Block also testified in his deposition as follows:

Q. As you sit hear today can you tell me for sure that Paul Morris did not notify you about that action in December?

A. Say that again?

Q. Sure. Can you tell me for certain that Paul Morris never notified you about that action during the month of December?

A. That he never notified me?

Q. Right. During December.

A. *I can't say that he never notified me. We had notification*, and I believe – we had notification. I can't say when it was. I can't recall exactly when it came in.

*Id.* at 370. Thus, Block admitted that no one from Phoenix lied to him, that he was unable to say that Morris never notified him, and that Meadows was notified about the enforcement action. Under these facts and circumstances, we cannot say that a genuine issue of material fact exists regarding the issue of Meadows notice of the enforcement action. Accordingly, the trial court properly granted summary judgment in favor of Phoenix on the issue of fraud.

## Conclusion

[33] The trial court did not err in granting summary judgment in favor of Phoenix on Meadows' claims of breach of contract and its request for specific performance because there is no genuine issue of material fact regarding Meadows' own inability to perform under the Agreement. Similarly, the trial court properly granted summary judgment in favor of Phoenix on Meadows' claim of fraud because no genuine issue of material fact exists with regard to

Meadows having notice of the enforcement action. Accordingly, we affirm the judgment of the trial court.

[34]   Affirmed.

Vaidik, C.J., and Robb, J., concur.