**Julius J. ANDERSON, Appellant–Respondent,**

v.

**Richard M. IVY, Appellee–Petitioner.**

**No. 18A04–1107–MI–357.**

Court of Appeals of Indiana.

Oct. 11, 2011.

---

William R. Groth, Fillenwarth Dennerline Groth & Towe, LLP, Indianapolis, IN, Attorney for Appellant.

John H. Brooke, Ralph E. Dowling, Muncie, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Richard Ivy ("Ivy"), an unsuccessful candidate for the Democratic Party nomination for Muncie City Council, filed in Delaware Circuit Court a petition to contest the primary election in which Julius Anderson ("Anderson") was declared the winner. The trial court granted Ivy's petition after concluding that Ivy met his burden of proving that he was entitled to a special election. Anderson appeals and argues that the trial court's decision is contrary to law because there was no evidence presented that his unlawful conduct affected any person's vote. Our review of the record does not disclose any evidence that Anderson's misconduct affected any votes, and therefore, we reverse.

### Facts and Procedural History

On Primary Election Day, May 3, 2011, Anderson, Ivy, and Harold Mason, Jr., were candidates for the Democratic Party's nomination for the Muncie City Council in District 6. District 6 consists of six precincts, including Precincts 12 and 20. Voters residing in Precinct 12 voted at the Roy C. Buley Community Center, and those residing in Precinct 20 voted at Price Hall. Anderson prevailed in the primary and received 519 votes to Ivy's 509 votes and Mason's 403 votes. The Delaware County Election Board certified the results.

On May 16, 2011, Ivy filed a verified petition to contest the election. Specifically, he requested a special election in Precincts 12 and 20 and alleged that Anderson committed acts at those precincts' polling places that made it impossible to determine which Democratic candidate for the office of City Counsel District 6 received the highest number of legal votes. On June 23, 2011, the Delaware Circuit Court held a bench trial on Ivy's petition. On July 15, 2011, the trial court issued its findings of fact and conclusions of law, and ordered a special election to be held in Precincts 12 and 20 for the Democratic nomination for the Muncie City Counsel, District 6.

In support of its decision to order a special election, the trial court entered meticulous findings of fact and conclusions of law, which provide in pertinent part:

9. In Ind.Code 3–5–2–10, "chute" means the area or pathway that extends fifty (50) feet in length, measured from the entrance to the polls. If the property line of the polling place is less than

fifty (50) feet from the door or entrance to the polling place, the chute is measured from the exterior door or entrance to the polling place to one-half (1/2) the distance to the property line of the polling place nearest to the entrance to the polls.

10. In Ind.Code 3–5–2–39, "polls" means the room in a structure where the voters of a precinct vote by casting ballots.

\* \* \*

16. Under Ind.Code 3–14–3–15(3), Anderson was not allowed to "remain within a distance equal to the length of the chute (as defined in IC 3–5–2–10) of the entrance to the polls except for the purpose of offering to vote."

\* \* \*

28. At approximately 6:15 a.m. at the Buley Center on May 3, 2011, Myrna Robertson ("Robertson"), the campaign chairman and a volunteer for Richard Ivy, observed Anderson in the Buley Center sitting at a desk just inside the front doors.

29. Robertson told him that he was not permitted to be inside the Buley Center under the law because he was a candidate. In response, Anderson stated that he was a precinct committeeman and that he could be inside.

30. The conversation between Robertson and Anderson lasted fifteen minutes, during which time voters entered the building to cast their votes.

31. Robertson stated that Anderson was wearing an orange hat and his red and white campaign t-shirt with his jacket open.

\* \* \*

33. Ronnie White ("White"), a campaign volunteer for Harold Mason, Jr., observed Anderson inside the Buley

Center shortly after 6:20 a.m., giving instructions to his mother-in-law and father-in-law about picking up voters and bringing them to the Precinct 12 polls to vote.

34. White advised Anderson that he should not be inside the building because Anderson was a candidate.

\* \* \*

36, Mark Roberts ("Roberts"), a campaign volunteer for Harold Mason, arrived at the Buley Center around 6:30 a.m. and he saw Anderson inside the front door by the desk. According to his testimony, an old lady was sitting at the desk.

\* \* \*

38. Roberts observed that Anderson was inside the Buley Center during times when voters were entering and exiting the premises.

39. Anderson remained inside the Buley Center off and on for the next hour and a half.

40. Larry Riley ("Riley") had media watcher credentials when he went to the Precinct 12 polls. He was there for ten minutes and had a five-minute conversation with Anderson while both were inside the Buley Center.

41. At 7:45 a.m., Anderson was still inside and Robertson again told him he should not be inside the Buley Center. Anderson did not acknowledge her statement.

42. Both Robertson and White observed Anderson bring voters to Precinct 12 polls to vote and escort the voters inside the front doors of the Buley Center.

\* \* \*

55. John Beatty ("Beatty") a campaign volunteer for Mason, arrived at the Buley Center between 8:30 and 8:45 a.m. in

response to telephone calls he had received voicing concern about the actions of Anderson at the Buley Center.

56. Beatty saw Anderson sitting on a chair just inside the front door and also observed Anderson's mother-in-law, Mrs. Olden at the front desk.

57. Beatty observed Anderson wearing his red and white campaign t-shirt.

\* \* \*

70. Beatty returned to the Buley Center at 10:30 a.m. and he observed Anderson still inside the Buley Center in the same location only standing this time.

71. Beatty called [Delaware County Clerk Steven] Craycraft to complain about Anderson being inside the Buley Center, but was unable to speak to him by telephone.

72. Beatty proceeded to the Delaware County Building to personally speak with Craycraft.

\* \* \*

74. Craycraft called Inspector [Karen] Rowe who informed him that Anderson and his mother-in-law, Mrs. Olden, had watcher credentials.

75. After reading the appropriate sections of the Indiana Code, Craycraft telephoned Rowe and told her that Anderson was ineligible to be a watcher because of his candidacy and that Mrs. Olden, as a watcher, should be inside the polling place, located inside the gymnasium.

76. Beatty returned to the Buley Center (Precinct 12 polls) and witnessed Inspector Rowe and Sheriff Adams announce their order. They informed those present that no one was allowed in the building (except for voters) and that the restroom privileges were revoked.

\* \* \*

80. Anderson entered the Buley Center multiple times after the order was announced.

\* \* \*

83. After the order was announced, Anderson acted as a greeter, opening the front door of the Buley Center for voters and talking to the voters as they went inside to vote within fifty feet of the polls.

\* \* \*

85. After the order was announced at Precinct 12 polls, Anderson was observed inside Price Hall, the location of Precinct 20 polls.

86. Norman Hawkins ("Hawkins"), a campaign volunteer for Harold Mason, Jr., testified that the doors of the polls for Precinct 20 were located between twenty and twenty-five feet from the front door of Price Hall.

87. Hawkins was at Price Hall for eleven and one-half hours during the Primary and observed Anderson just inside the front door talking with voters and handing them his campaign cards.

\* \* \*

91. Ivy arrived at Price Hall after Anderson and observed Anderson enter and exit Price Hall three or four times.

Appellant's App. pp. 13–18.

After making these findings, the trial court concluded that Ivy met his burden of establishing that he is entitled to a special election. Specifically, the court concluded:

40. Ivy has demonstrated, by clear and convincing evidence, that Anderson participated in a series of deliberate acts that he knew or reasonably should have know would make it impossible to determine which candidate received the most legal votes cast in this primary election.

41. Ivy has demonstrated, by clear and convincing evidence, that Anderson's de-

liberate acts and that the failure to enforce election laws in a timely manner infected the election process to an extent that profoundly undermined the integrity of the election and the trustworthiness of the election's outcome.

42. This Court finds that there is clear and convincing evidence that a series of deliberate acts of the Respondent, Julius Anderson, compounded by the troubling lack of knowledge and timely enforcement of election laws by precinct election officers in a very close and hotly contested race make it impossible to determine who received the largest number of legal votes in the primary election for the Democratic nomination for the Common Council of the City of Muncie in District 6.

Appellant's App. p. 24.

Anderson filed his notice of appeal on July 19, 2011. Shortly thereafter, Anderson filed a motion for stay pending appeal. Our court granted Anderson's motion for stay on August 12, 2011.

### Standard of Review

■■■ Ivy requested that the trial court enter findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A). When a trial court enters findings and conclusions, we apply a two-tiered standard of review; first we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Smith v. Smith*, 938 N.E.2d 857, 860 (Ind.Ct.App.2010). "In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment." *Id.* We do not reweigh the evidence, and we consider only the evidence favorable to the trial court's judgment. *Id.* The party appealing the trial court's judgment must establish that the findings are clearly erroneous. *Id.* "Find-

ings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made." *Id.* We do not defer to conclusions of law, which are evaluated de novo. *Id.*

### Discussion and Decision

■■■ Election procedures are generally matters for legislative determination, but elections do not "belong to the 'political branch of government,' if by that term is meant the legislative branch of government." *Pabey v. Pastrick*, 816 N.E.2d 1138, 1141 (Ind.2004) (quoting *State ex rel. Nicely v. Wildey*, 197 N.E. 844, 847, 209 Ind. 1, 8 (1935)).

> Elections belong to the sovereign people. The qualifications of electors and other matters concerning elections are prescribed by the Constitution. The Legislature may set up machinery for the conduct of elections, and delegate to ministerial or executive agencies the duty of conducting elections, and may prescribe the procedure by which elections may be contested, so long as they stay within their constitutional powers, and such procedure conforms to the law, such steps and procedure will be governed by the legislative rules prescribed. *But courts have inherent power to protect the sovereign people, and those who are candidates for office or claiming title to or rights in an office from fraud or unlawfulness[.]*

*Id.* (quoting *State ex rel. Nicely*, 197 N.E. at 847, 209 Ind. at 8–9) (emphasis in original).

With these principles in mind, we observe that Indiana law provides two methods to examine the results of elections: an election "recount" and an election "contest." *See* Ind.Code §§ 3–12–6–1 et seq. (recount) and 3–12–8–1 et seq. (contest). Ivy did not seek a recount but proceeded under Indiana Code chapter 3–12–8

("Election Contest Statute"), and therefore, what is at issue in this proceeding is solely an election "contest."

The Election Contest Statute provides that "[t]he court shall determine the issues raised by the petition and answer to the petition." I.C. § 3–12–8–17(b). Relevant to the issue before us, both section 3–12–8–2 of the statute, which prescribes the grounds upon which an election may be contested, and section 3–12–8–6, which designates the required content of a petition to contest an election, contain substantially similar language specifying that an election may be contested on the following grounds:

(1) The contestee was ineligible.

(2) A mistake occurred in the printing or distribution of ballots used in the election that makes it impossible to determine which candidate received the highest number of votes.

(3) A mistake occurred in the programming of an electronic voting system, making it impossible to determine the candidate who received the highest number of votes.

(4) An electronic voting system malfunctioned, making it impossible to determine the candidate who received the highest number of votes.

(5) A deliberate act or series of actions occurred making it impossible to determine the candidate who received the highest number of votes cast in the election.

I.C. § 3–12–8–2; *see also* I.C. § 3–12–8–6(a)(3).

Ivy contested the results of the Muncie City Council District 6 Democratic primary pursuant to subsection (5), that is, that a deliberate series of actions had occurred that made it impossible to determine the candidate who had received the highest number of votes cast in the pri-

mary. Further, section 3–12–8–6(c) provides that a "petition stating that the petitioner believes that an act or series of actions described in subsection (a)(3)(E) occurred must identify each precinct or other location in which the act or series of actions occurred to the extent known to the petitioner."

In *Pabey v. Pastrick,* our supreme court concluded that the term, "deliberate actions," contained in sections 3–12–8–2(5) and 3–12–8–6(a)(3)(E) "presents various difficulties in interpretation ... [and] [i]t is not susceptible to literal interpretation and application." 816 N.E.2d at 1148. After applying the "well-recognized principles" of statutory construction, the court ultimately held:

the burden upon a challenger seeking a special election under the Deliberate Actions ground in subsections 2(5) and 6(a)(3)(E) of the Election Contest statute is to conclusively demonstrate (a) the occurrence of an act or series of actions by one or more persons who knew or reasonably should have known that such conduct would make it impossible to determine which candidate receives the most legal votes cast in the election, *and (b) the deliberate act or series of actions so infected the election process as to profoundly undermine the integrity of the election and the trustworthiness of its outcome.*

*Id.* at 1150 (Emphasis added.). A "contestor need not prove to a mathematical certainty that the number of invalid votes equaled or exceeded the contestee's margin of victory, but such proof would of course be sufficient to warrant relief." *Id.* at 1150 n. 4. Most importantly, our supreme court observed that a "special election should be ordered only in rare and exceptional cases." *Id.*

Neither party included a copy of Ivy's petition for election contest in the record. But from our review of the record and the

trial court's exhaustive findings of fact and conclusions of law, we can surmise that in his petition, Ivy primarily contested the election because of Anderson's presence in the chute and polls at Precincts 12 and 20 on primary election day while displaying his campaign attire and, on occasion, distributing campaign literature.

It is undisputed that Anderson violated numerous election laws during the primary. Candidate Anderson was present in the "chute",[1] i.e. the fifty-foot area or pathway measured from the entrance of the polls, and in the polls themselves, which is prohibited under Indiana Code sections 3–11–8–15 and 3–11–8–16 (listing which persons are permitted in the polls during an election and providing that an individual's presence in the chute is only allowed for the purpose of offering to vote). When questioned about his presence in the chute and polls, Anderson stated he was permitted in those areas as a "poll watcher" and because he is a precinct committeeman. But as a candidate, Anderson was not permitted to serve as a precinct election officer or poll watcher. See I.C. §§ 3–6–6–7; 3–6–8–2. The Precinct 12 Inspector and Sheriff failed to understand these election laws and failed to enforce them.

Moreover, Anderson engaged in electioneering in the polls and chute at both precincts because he was wearing his campaign shirt, and he distributed his campaign cards in the chute at Precinct 20, which conduct is prohibited under Indiana Code section 3–14–3–16.[2] But the individuals subpoenaed to testify in the election contest generally could not recall whether Anderson was wearing his campaign shirt.

And those who spoke with Anderson testified that they simply said hello or engaged in "small talk." Tr. pp. 22–23, 31, 40, 53–54, 87. Only two witnesses, a volunteer for Team Democrat and a volunteer for Richard Ivy, testified that they observed Anderson was wearing his campaign shirt. Tr. pp. 61, 74, 162.

Anderson also drove a few elderly voters to Precinct 12, entered the chute with those voters, and opened the door for them. Tr. pp. 86, 164. A volunteer for Harold Mason's campaign testified that Anderson was in the chute near the doors at Precinct 20 speaking to people as they entered and exited the polls, and he saw Anderson at the Precinct three or four times that day for five to ten minutes each time. Tr. pp. 147, 156. Anderson also distributed his campaign literature while at Precinct 20. Tr. p. 155. Anderson also continued to enter the chute and polls at both precincts after he was told he was not permitted to do so.

Anderson acknowledges his violation of the election laws, but argues that his actions cannot be equated to the widespread pervasive pattern of misconduct in *Pabey*. *Pabey* involved an appeal surrounding the Democratic nomination for the office of the mayor of the City of East Chicago. Robert Pastrick prevailed in the election over George Pabey by nearly 300 votes. Pabey received 199 more votes than Pastrick of those personally cast on election day. But in absentee voting, Pastrick defeated Pabey by 477 votes. Pabey contested the election and was unsuccessful in the trial court, but on appeal, our supreme court reversed and ordered the trial court to order a special election.

---

1. *See* Ind.Code § 3–5–2–10.

2. An individual who knowingly engages in electioneering, which "includes expressing support or opposition to any candidate or political party or expressing approval or disapproval of any public question in any manner that could reasonably be expected to convey that support or opposition to another individual," on election day within the polls or chute commits a Class A misdemeanor. *See* I.C. § 3–14–3–16.

The court observed that Pastrick's campaign engaged in a predatory pattern of inducing voters "that were first-time voters or otherwise less informed or lacking in knowledge of the voting process, the infirm, the poor, and those with limited skills in the English language, to engage in absentee voting." 816 N.E.2d at 1145. Pastrick's supporters provided compensation or the expectation of compensation to induce voters to cast their ballot via the absentee process. Pastrick's supporters also directed applicants for absentee ballots to contact them when the ballot was received so that the supporter could proceed to the absentee voter's home to assist the voter in completing the ballot. *Id.* And Pastrick used vacant lots or former residences of voters on applications for absentee ballots. Finally, Pastrick's supporters unlawfully possessed absentee ballots, filled out absentee ballots to which applicants simply affixed their signature, falsely represented that the applicant expected to be absent from Lake County on election day, and assisted City of East Chicago employees who did not reside in that city to cast votes in the election.

After considering this evidence, our supreme court concluded:

> The magnitude, pervasiveness, and widespread effect of the deliberate series of actions found in this case leads to but one conclusion. The Pastrick campaign certainly knew or consciously intended that the results of their conduct would so inhibit opposing votes and inject invalid favorable votes as to profoundly undermine the integrity of the election and the trustworthiness of its outcome. And this objective was clearly achieved. Given the exceptional facts and circumstances of this case, any other conclusion is inconceivable.

*Id.* at 1151.

In the case before us, we are sympathetic to Ivy's argument given Anderson's numerous violations of our election laws and the Precinct 12 poll workers' misinterpretation of those laws and failure to enforce them. Anderson's conduct was at best, ill-informed, and at worst, reprehensible. But Anderson's actions, and any effect they may have had, occurred in only two out of six precincts. The evidence presented at trial established that Anderson was present at Precinct 12 for a few hours in the morning and early afternoon and for approximately one hour at Precinct 20 throughout the day. Most important of all, Ivy conceded that he failed to present any evidence that Anderson's presence and actions in the chute and/or polls at Precincts 12 and 20 "changed a single voter's vote." *See* Tr. p. 204. There was no evidence presented from which we could conclude that Anderson corrupted the election results or that he intimidated or manipulated any voters. In other words, there is no evidence from which our court could conclude that Anderson's actions substantially undermined the reliability of the election.

"[T]he results of an election contested under the Deliberate Actions ground may not be set aside and a special election ordered unless the deliberate acts or series of actions succeed in substantially undermining the reliability of the election and the trustworthiness of its outcome." *See Pabey*, 816 N.E.2d at 1150. It bears repeating that a "special election should be ordered only in rare and exceptional cases." *Id.* Simply said, this is not a rare and exceptional case that warrants a special election. Accordingly, we reverse the trial court's order for special election.

Reversed.

BAILEY, J., and CRONE, J., concur.