## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 27 2018, 8:35 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Paul C. Sweeney
Derek R. Molter
Ice Miller LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Richard D. Trainor
Law Office of Richard D. Trainor
Michigan City, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| AmeriGlobe, LLC, <br> *Appellant-Defendant,* <br><br> v. <br><br> Victor Althoff, <br> *Appellee-Plaintiff.* | March 27, 2018 <br><br> Court of Appeals Case No. 46A05-1708-PL-1845 <br><br> Appeal from the LaPorte Superior Court 2 <br><br> The Honorable Richard L. Stalbrink, Jr., Judge <br><br> Trial Court Cause No. 46D02-1303-PL-361 |

**Mathias, Judge.**

[1]    AmeriGlobe, LLC ("AmeriGlobe") appeals the judgment of the LaPorte Superior Court in favor of Victor Althoff ("Althoff") in Althoff's complaint alleging breach of an employment contract and seeking damages under the

Indiana Wage Claims Statute. On appeal, AmeriGlobe presents three issues, which we consolidate, reorder, and restate as the following two: (1) whether the trial court erred in denying AmeriGlobe's motion for summary judgment on grounds that Althoff's claims under the Wage Claims Statute are barred because Althoff failed to submit his claim to the Indiana Department of Labor until after he had already filed his complaint; and (2) whether the trial court clearly erred in determining that AmeriGlobe breached an employment contract with Althoff.

[2]　We reverse and remand.

## Facts and Procedural History

[3]　The basic facts underlying this case are relatively undisputed. Althoff was a veteran sales representative, with over thirty years of experience selling a variety of products, including filtration bags and bulk bags.[1] In the first half of 2010, Althoff worked for a competitor of AmeriGlobe. But when he learned that the company that he then worked for might be sold, he became concerned about his job security and started looking for other sales positions. Althoff was familiar with AmeriGlobe and reached out to its co-owner and president, Dan Schnaars ("Schnaars"). Schnaars informed Althoff that the standard compensation for AmeriGlobe sales representatives was an annual salary of $36,000 plus the

---

[1] "Bulk bags" are large bags made from the plastic polypropylene and are used to transport and store material in large quantities, e.g., salt, sand, or concrete mix.

company standard commission of 2% of "list" or base price, plus 30% of "overage," i.e., any price the sales representative could get over the list price.[2] This scheme incentivized sales representatives to obtain a selling price higher than the list price.

[4] In recognition of Althoff's experience, he and Schnaars came to a different agreement regarding Althoff's compensation. Specifically, they agreed that Althoff would initially earn $6,800 per month (instead of the standard $3,000) and earn only one-half of the company standard commission, i.e., 1% of list price plus 15% of overage.[3] They also agreed that Althoff's salary would be reduced by $200 per month starting June 1, 2011, until it eventually reached $3,000. Also starting June 1, 2011, Althoff would start earning the company standard commission instead of one-half of the standard commission. This would allow Althoff to earn a more comfortable salary as he built up his sales. To memorialize this arrangement, the parties drafted a one-page written agreement which reads as follows:

August 23, 2010
Employment Agreement
Between
Victor Althoff
And

---

[2] Under this commission structure, for example, if the list price of a bag was $15 and the sales representative sold the bag to a customer for $20, then he would earn a commission of 2% of $15 ($0.30) plus 30% of the $5.00 overage ($1.50), for a total commission of $1.80 per bag.

[3] Under this commission structure, for example, if the list price of a bag was $15 and the sales representative sold the bag to a customer for $20, then he would earn a commission of 1% of $15 ($0.15) plus 15% of the $5 overage ($.75), for a total commission of $.90 per bag.

AmeriGlobe, LLC

| | |
|---|---|
| Employment Start Date: | August 23, 2010 |
| Position: | Territorial Sales Representative |
| Territory: | As defined from time to time. Initial territory includes Upper Illinois, Wisconsin, Minnesota, North and South Dakota. (Territories are not exclusive and will vary over time[.]) |
| Compensation Salary | Adjustable Salary and Commission.<br><br>From August 23, 2010 to May 30, 2011, salary will be $6800 per month with first month pro-rated according to days employed.<br><br>Starting on June 1, 2011 salary will be adjusted downward by $200 per month until standard salary of $36,000 per year is reached. |
| Commissions | From August 23, 2010 until June 1, 2011 commissions will be 50% of company standard. Commissions will be paid monthly according to company standards. |
| Benefits | Company Standard Health Insurance benefits[.] |
| Vacation | One week after January 1, 2011. One more week after August 23, 2011. Starting January 1, 2012, Victor is eligible for 2 weeks per year. |
| Expenses | 100% reimbursement for approved travel. Shared expenses based on company standards once $110,000 per month in sales has been achieved for 3 consecutive months. |

| Equipment | Company provides laptop and printer. |
| --- | --- |
| Car | Company provides $350 per month in car allowance. |
| Exclusivity | AmeriGlobe will be the only source of income unless otherwise approved in writing. |
| Term of Employment | At the discretion of AmeriGlobe and Victor's satisfaction. |

Appellant's App. Vol. 2, p. 49. Although neither party signed this written memorialization, both parties concede that this document accurately represents their agreement.

[5] At the time Althoff was hired, in addition to selling bulk bags, AmeriGlobe was also preparing to start marketing a new product known as the TrapBag. Inventor Buzz Wade ("Wade") had contacted AmeriGlobe in May of 2010 to discuss the possibility of AmeriGlobe manufacturing and selling the soon-to-be-patented TrapBag as a large-scale flood mitigation solution. Traditional sand bags contain between 50 to 100 pounds of sand and are stacked to help hold back flood waters, but have problems with leakage between the bags. In contrast, TrapBags are five-sided bags that have thirty cells each and are sewn together to form contiguous sections, usually 100 feet long. Each 100-foot section of TrapBags can hold up to 200,000 pounds of sand and can be linked together to form miles of contiguous flood barriers. Before being filled, a 100-foot section of TrapBags can be compressed into just 6 feet and unfolded like an accordion as it is deployed and filled with sand or other filler.

[6]    The following image of the TrapBag system is taken from the patent application:



Dimensional Details
A – Vertical height
B – Base length (always equal to A+24 inches (0.61 m)
C – Height of front toe
D – Length of Diagonal face
E – Length of filling Mouth
F – Width of Main Panel and width of Filling Mouth
G – Main Panel, It is equal to A+B+C+D

A= 72 in. (1.83 m)
B= 96 in. (2.44 m)
C= 12 in. (0.30 m)
D= 84.6 in. (2.15 m)
E= 36 in. (0.91 m)
F= 32 in. (0.81 m)

*See* Ex. Vol. 3, Defendant's Ex. Y p. 3.

[7]    Althoff first saw the TrapBag in October 2010, when he went to AmeriGlobe's headquarters in Lafayette, Louisiana for training. There, he saw a product demonstration. Althoff began to sell bulk bags the following month and also began to look for opportunities to sell the TrapBag. Althoff attended trade shows to find potential buyers for the TrapBag. On February 14, 2011, Althoff

received an order of TrapBags from the City of Fargo, North Dakota in the amount of $860,038.72. This was AmeriGlobe's first sale of the TrapBag.

[8] On February 17, 2011, Schnaars telephoned Althoff and told him that the commission for the TrapBag sales would be different than for bulk bags. Specifically, Schnaars stated that AmeriGlobe would pay sales representatives a flat commission on sales of the TrapBag instead of the company standard of 2% of list and 30% of overage, or in Althoff's case, one half of the company standard. AmeriGlobe paid a 5% flat commission to Althoff for the Fargo sale, which amounted to $43,001.19. This was actually higher than the amount Althoff would have received under the one-half company standard commission rate for sales of bulk bags he claimed to be entitled to. Indeed, Althoff admitted that, under the one-half company standard commission rate, his commissions for the Fargo sale would have been $38,818.56.[4]

[9] When Althoff received his commission statement covering the Fargo sale, he called Schnaars to complain. Schnaars informed him that AmeriGlobe was going to use a flat commission rate for the sale of TrapBags. For the first two

---

[4] Althoff sold Fargo 21,120 feet of four-foot TrapBags for $490,083.72, or $23.20 per foot. The list price for the four-foot TrapBags was $18 per foot. Thus, under the one-half company standard commission rate, Althoff would have earned 1% of the list price of $18 per foot, or $3,801.60 ($18 × 21,120 feet = $380,160 × 1% = $3,801.60), plus 15% of the overage of $5.20 per foot, or $16,473.60 ($5.20 × 21,120 = $109,824 × 15% = $16,473.60) for a commission of $20,275.20 for the four-foot bags. *See* Tr. Vol. 2 p. 161–62. Althoff also sold Fargo 10,560 feet of six-foot TrapBags for $370,000, or $35.04 per foot. The list price for the six-foot TrapBags was $25, for an overage of $10.04 per foot. Under the one-half company standard commission, Althoff would have earned 1% of the list price of $25 per foot, or $2,640 ($25 × 10,560 = $264,000 × 1% = $2,640), plus 15% of the overage of $10.04, or $15,903.36 ($10.04 × 10,560 = $106,022.40 × 15% = $15,903.36) for a commission of $18,543.36 for the six-foot bags. *See id.* Thus, under the one-half company standard, Althoff would have earned a commission of $38,818.56.

sales, the flat rate was 5%, and for most others, it was 4%. Schnaars explained that there were two main reasons for not using the company standard commission for the TrapBag. First, the TrapBag was used in emergency situations, and AmeriGlobe did not want to have in place a commission that encouraged its sales representatives to get the highest possible price in such situations. AmeriGlobe is based in Louisiana, and Schnaars had heard of companies being sued as a result of price gouging during the aftermath of Hurricane Katrina. Second, AmeriGlobe had to split its profits on the TrapBag equally with Wade. Althoff later testified that, when informed of the change in the commissions for the TrapBag, he had two choices: "I could quit. I could continue to work." Tr. Vol. 2, p. 150. Althoff continued to work.

[10]    In April 2011, Althoff sold 5,280 feet of four-foot trap bags to Cass County, North Dakota, for $140,701.22, or $26.64 per foot. AmeriGlobe paid Althoff a flat commission of 5%, or $7,035.06. Under the one-half company standard commission rate Althoff claims should have been used, he would have received a commission of $7,793.28.[5] Thus, Althoff claims that AmeriGlobe owes him an additional $758.22 for this sale.

[11]    At some point after this sale, AmeriGlobe changed the flat commission rate for sales of the TrapBag to 4%, but Althoff continued to earn the one-half company

---

[5] The list price of the four-foot TrapBags was $18. Althoff's overage for this sale was $8.64 per foot ($26.64 − $18 = $8.64). Under the one-half company standard commission, Althoff would have earned a commission of 1% of the list price, or $950.40 ($18 × 5,280 = $95,040 × 1% = $950.40), plus 15% of the overage, or $6,842.88 ($8.64 × 5,280 = $45,619.20 × 15% = $6,842.88). Thus, Althoff's total commission under a one-half company standard would have been $7,793.28.

standard commission on sales of bulk bags. On June 15, 2011, Althoff sold 9,500 feet of four-foot TrapBags to Burleigh County, North Dakota for $334,590, or $35.22 per foot. AmeriGlobe paid Althoff a flat 4% commission of $13,383.60 on this sale. The commission payable at the one-half company standard would have been $26,248.50,[6] a difference of $12,864.90.

[12] In July 2011, Althoff sold to the North Dakota Department of Emergency Services 21,900 feet of four-foot TrapBags for a price of $711,318, or $32.48 per foot, and 2,200 feet of six-foot TrapBags for $116,226, or $52.83 per foot. AmeriGlobe paid Althoff a commission of only $8,533.36 on this $827,544 sale, which is considerably less than even the 4% AmeriGlobe claims was the commission rate for all TrapBag sales.[7] By this time, under the terms of the Employment Agreement, Althoff would have been earning the full company standard commission rate of 2% of list price plus 30% of overage, or $122,485.40.[8] Accordingly, Althoff claims that AmeriGlobe still owes him $113,952.04 in commissions for this sale.

---

[6] Since the list price for the four-foot TrapBag was $18, Althoff's overage on this sale was $17.22. One percent of the list price was $1,710 ($18 × 9,500 = 171,000 × 1% = $1,710), plus 15% of the overage of $24,538.50 ($17.22 × 9500 = $163,590 × 15% = $24,538.50), for a total of $26,248.50.

[7] In fact, this constitutes 1.03% of the total sales price. Four percent of $827,544 is $33,101.76. Accordingly, even under the 4% flat commission, AmeriGlobe underpaid Althoff $24,568.40 for this sale.

[8] The overage for the sale of the four-foot bags was $14.48 ($32.48 − $18.00). Using the company standard commission rate, the commission for the sale of the four-foot bags would have been 2% of list price, or $7,884 ($18 × 21,900 = $394,200 × 2% = $7,884), plus 30% of overage, or $95,133.60 ($14.48 × 21,900 = $317,122 × 30% = $95,133.60), for a total commission of $103,017.60 for the four-foot bags. For the six-foot bags, the overage was $27.83 ($52.83 − $25.00). Using the company standard commission rate, the commission for the sale of the six-foot bags would have been 2% of list price, or $1,100 ($25 × 2,200 = $55,000 × 2% = $1,100),

[13]     Also in July 2011, Althoff sold to the Iowa Department of Transportation 49,400 feet of four-foot TrapBags for a total price of $1,976,000, or $40 per foot. AmeriGlobe paid Althoff a commission of $70,080.[9] Under the company standard commission Althoff claims he should have paid, he would have earned a commission of $343,824.[10] Thus, Althoff claims AmeriGlobe still owes him $273,744 in commissions for this sale.

[14]     Lastly, on July 15, 2011, Althoff sold 6,000 feet of four-foot TrapBags to the State of Nebraska for a price of $211,320, or $35.22 per foot. AmeriGlobe paid Althoff a 4% commission of $8,452.80. The commission payable at the company standard rate would have been $33,156.00.[11] Thus, Althoff claims that AmeriGlobe owes him the difference of $24,703.20.

[15]     On August 11, 2011, AmeriGlobe terminated Althoff's employment, citing his failure to provide requested paperwork and failing to travel to company headquarters when asked.[12] During this term of employment, Althoff was paid

---

plus 30% of overage, or $18,367.80 ($27.83 × 2,200 = $61,266 × 30% = $18,367.80), for a total commission of $19,467.80 on the six-foot bags. The total commission for this sale would have been $122,485.40.

[9] We note that 4% of $1,976,000 is $79,040.00, not $70,080. AmeriGlobe's commission statement shows that it paid no commission on one of the invoices that was part of this order, amounting to a $8,960 shortfall.

[10] The overage for this sale was $22 ($40 − $18). Using the company standard commission rate, the commission for the sale of these bags would have been 2% of list price, or $17,784 ($18 × 49,400 = 889,200 × 2% = $17,784), plus 30% of overage, or $326,040 ($22 × 49,400 = $1,086,800 × 30% = $326,040), for a total commission of $343,824.

[11] The overage for this sale was $17.22. Under the company standard overage, Althoff's commission for this sale would have been 2% of list price, or $2,160 ($18 × 6,000 = $108,000 × 2% = $2,160), plus 30% of overage, or $30,996 ($17.22 × 6,000 = 103,320 × 30% = $30,996), for a total commission of $33,156.

[12] Althoff alleged that AmeriGlobe terminated him so that it would not have to pay the full amount of the commissions owed on the TrapBag sales, but the trial court rejected this contention.

$317,000. Even though he was terminated, AmeriGlobe also paid Althoff a bonus of $41,000.

[16] Althoff's unemployment did not last long. Just a few weeks after terminating him, Schnaars telephoned Althoff and rehired him on September 12, 2011. During this second period of employment, AmeriGlobe agreed to pay Althoff a base salary of $180,000 and a 4% commission on gross sales over $1,000,000. Althoff focused on training other sales representatives to sell the TrapBag. On September 24, 2012, just over a year after being rehired, AmeriGlobe again terminated Althoff's employment. Althoff does not claim he is owed any additional amount for this period of employment.

[17] Once again, Althoff's unemployment did not last long, as AmeriGlobe rehired him yet again in November 2012 on a commission-only basis. This lasted until January 13, 2013, when Althoff's employment was terminated for the third and final time.[13]

[18] On March 1, 2013, Althoff filed a complaint alleging that AmeriGlobe had violated the Indiana Wage Claims Statute and that AmeriGlobe was unjustly enriched by underpaying Althoff's commissions. AmeriGlobe's answer included a defense that Althoff had not exhausted his administrative remedies under the Wage Claims Statute and that Althoff's claim under the Wage Claims

---

[13] Althoff's complaint alleged that he was owed an additional $33,000 in commissions for this period, but the trial court found against Althoff on this claim, and Althoff does not cross-appeal the trial court's resolution of this matter.

Statute was barred by a two-year statute of limitations. Althoff admitted during discovery that he had not filed a claim against AmeriGlobe with the Indiana Department of Labor but denied that this was required.

[19] AmeriGlobe subsequently moved for summary judgment on Althoff's claim under the Wage Claims Statute, arguing that it was entitled to judgment as a matter of law due to Althoff's failure to exhaust his administrative remedies. Althoff opposed summary judgment, claiming that he was not required to exhaust his administrative remedies because the Department of Labor would not pursue a claim in excess of $6,000. He also claimed that pursuing an administrative remedy would therefore be futile, as his claim was well in excess of this amount. Althoff further argued that he had cured any failure to exhaust his administrative remedies by attempting to submit his claim to the Department of Labor's online portal on October 9, 2013, only to have this attempt rejected due to the amount involved. He also argued that the trial court could still hear a claim for breach of contract and unjust enrichment.

[20] AmeriGlobe argued in reply that the $6,000 limit is for assigning claims to the Department of Labor and does not limit who must first submit claims to the Department of Labor to be investigated and vetted. It also argued that submitting the claim to the Department of Labor would not have been futile, as the Department was statutorily required to investigate the claim and, if warranted, appoint private counsel to pursue the claim. AmeriGlobe also noted that Althoff's complaint did not include a claim for breach of contract.

[21]   The trial court held a summary judgment hearing on March 28, 2014, and took the matter under advisement. On November 25, 2014, the trial court entered an order granting AmeriGlobe's motion, agreeing with AmeriGlobe that Althoff had not exhausted his administrative remedies. The trial court determined that "[t]he purpose of the Indiana Wage Claims Act's requirement that claims first be brought to the Department of Labor . . . is to create a barrier to claims to be filed in court, and [a] claim must work its way through proper channels, the [Department of Labor] and, if need be, [the] Attorney General, before it may be brought into court." Appellant's App. Vol. 2, p. 93. The trial court ordered Althoff to "formally file his claim with the Department of Labor and exhaust all administrative remedies before further pursuing this matter in court." *Id*. at 5.

[22]   On December 23, 2014, Althoff, now represented by new counsel, filed a consolidated motion for "Rehearing, Reconsideration, and Reinstatement of Count I, Request for Leave to Amend the Complaint or Alternatively, Motion for Certification of Interlocutory Order." *Id*. at 95–97. In his motion, Althoff averred that he had, as ordered, submitted an application for a wage claim to the Department of Labor on November 26, 2014,[14] and the Department determined that it could not accept the assignment of his claim. Instead, the Department authorized Althoff to pursue his claim with a private attorney. *Id*. at 103. Althoff's motion argued that his wage claim should be reinstated. It also requested leave to amend his complaint to add a claim for breach of contract

---

[14] In his Appellee's Brief, Althoff claims that he submitted his claim with the Department of Labor on December 1, 2014.

claim. Alternatively, it requested that the trial court certify its summary judgment order for interlocutory review.

[23] The trial court held a hearing on Althoff's consolidated motion on March 23, 2015, and on June 23, 2015, the court entered an order which granted Althoff's motion for leave to amend his complaint to add a claim for breach of contract, denied the motion to certify its order for interlocutory appeal, and ordered Althoff to submit a new wage claim to the Department of Labor. The trial court determined that Althoff had not given the Department of Labor an opportunity to investigate his claim or refer it to the Attorney General until he submitted his application on November 26, 2014. Thus, the court concluded that Althoff had not exhausted his administrative remedies and that his wage claim was invalid. The trial court ordered Althoff to file a new wage claim with the Department of Labor.

[24] On July 17, 2015, Althoff submitted another application for wage claim to the Department of Labor. On July 31, 2015, the Attorney General's office wrote to Althoff authorizing him to pursue his wage claim and authorizing his counsel to represent him on this claim. *Id.* at 192. On August 4, 2015, the Department of Labor sent Althoff a letter "authorizing [him] to pursue this matter with a private attorney licensed in the State of Indiana." *Id.* at 190.

[25] On August 11, 2015, Althoff filed an amended complaint with four counts. The first count alleged a breach of the 2010 employment agreement; the second count alleged a breach of his 2012 agreement to return to work for AmeriGlobe;

the third count alleged unjust enrichment; and the fourth count asserted a claim under the Indiana Wage Claims Statute. The complaint requested compensatory damages, liquidated damages, attorney fees, and costs. Althoff alleged that AmeriGlobe owed him $520,000 in unpaid commissions for the employment period between August 23, 2010 and August 9, 2011, and $33,000 in unpaid commissions for the employment period between November 2012 and January 14, 2013.

[26] AmeriGlobe filed its answer to the amended complaint on August 31, 2015, asserting that the wage claim was barred by the statute of limitations. AmeriGlobe also moved for partial summary judgment on the issue of the statute of limitations. The trial court held a hearing on this motion on March 17, 2017, and entered an order denying the motion on March 21, 2017.

[27] The trial court held a two-day bench trial on March 28–29, 2017. AmeriGlobe requested that the trial court enter specific findings and conclusions under Indiana Trial Rule 52. The parties submitted proposed findings and conclusions on April 28, 2017, and the trial court entered its findings of fact and conclusions of law on July 19, 2017. The trial court concluded that AmeriGlobe owed Althoff $421,836.73 in unpaid commissions, and it doubled those damages under the penalty provision of the Wage Claims Statute. The trial court further held that AmeriGlobe was liable to Althoff for an unspecified amount of court costs and attorney fees. On August 15, 2017, the court certified its order as a final, appealable order pursuant to Trial Rule 54(B), finding that there is no just reason to delay the entry of judgment. AmeriGlobe now appeals.

## I. Summary Judgment on Wage Claim

AmeriGlobe contends that the trial court erred when it denied its motion for summary judgment, which was based on AmeriGlobe's contention that Althoff had failed to exhaust his administrative remedies before filing his claim under the Wage Claims Statute.[15] On appeal from a trial court's ruling on a motion for summary judgment, we apply the same standard as the trial court. *M.S.D. of Martinsville v. Jackson*, 9 N.E.3d 230, 235 (Ind. Ct. App. 2014), *trans. denied*. That is, we consider only those facts that the parties designated to the trial court to determine whether there is a genuine issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. *Id*. We construe all factual inferences in favor of the non-moving party and resolve all doubts as to the existence of a material issue against the moving party. *Id*. The moving party bears the burden of making a *prima facie* showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Id*. Once the movant makes this prima facie showing, the burden shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact. *Id*. Still, the party appealing a summary judgment decision bears the burden of persuading this court that the grant or denial of summary judgment was erroneous. *Id*. Where

---

[15] The Wage Claims Statute is applicable to employees who have been separated from work by their employer and employees whose work has been suspended as a result of an industrial dispute. *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699, 705 (Ind. 2002) (citing Ind. Code § 22-2-9-2). In contrast, the Wage Payment Statute references current employees and those who have voluntarily left employment *Id*. (citing Ind. Code § 22-2-5-1(b)). Here, Althoff proceeds only under the Wage Claims Statute.

the facts are undisputed and the issue presented is a pure question of law, we review the matter *de novo*. *Id*.

[29] AmeriGlobe argues that Althoff's failure to submit his complaint to the Indiana Department of Labor before he filed suit bars his claim. AmeriGlobe's argument has support. For example, in *St. Vincent Hospital & Health Care Center, Inc. v. Steele*, 766 N.E.2d 699 (Ind. 2002), our supreme court analyzed the Wage Payment Statute and the Wage Claims Statute. With regard to the latter, the court explained:

> *Claimants who proceed under this statute may not file a complaint with the trial court.* Rather, the wage claim is submitted to the Indiana Department of Labor. It then becomes "the duty of the commissioner of labor to enforce and to insure compliance with the provisions of this chapter, to investigate any violations of any of the provisions of this chapter, and to institute or cause to be instituted actions for penalties and forfeitures provided under this chapter." I.C. § 22-2-9-4(a). To that end, the commissioner "may hold hearings to satisfy himself as to the justice of any claim, and he shall cooperate with any employee in the enforcement of any claim against his employer in any case whenever, in his opinion, the claim is just and valid." *Id*. Further, the commissioner may take assignments of wage claims under $800[16] and refer wage claims to the Attorney General, who may then initiate a civil action on behalf of the wage claimant or refer the wage claim to a private attorney. I.C. §§ 22-2-9-4(b), -5. Claimants whose lawsuits have been initiated by the Attorney General or the Attorney General's designee are entitled to recover liquidated damages and

---

[16] This amount has since been increased to $6,000. *See* I.C. § 22-2-9-5(a) (as amended by P.L.165-2007 § 2).

attorney fees as set forth in Indiana Code section 22-2-5-2. I.C. §
22-2-9-4(b).

*Id*. at 705 (emphasis added).[17]

[30] And in *Naugle v. Beech Grove City Schools*, 864 N.E.2d 1058, 1062 (Ind. 2007),
the court held that although claimants under the Wage Payment Statute may
proceed by filing a complaint, "the Wage Claims Statute requires that a wage
claim be submitted to the Department of Labor for administrative
enforcement." Yet again, in *Quimby v. Becovic Management Group., Inc.*, 962
N.E.2d 1199, 1200 (Ind. 2012), the court held that "an employee who has a
claim under the Wage Claims Statute must first exhaust an administrative
remedy with the DOL *before* filing a lawsuit." (citing I.C. § 22-2-9-4) (emphasis
added); *see also Hollis v. Def. Sec. Co.*, 941 N.E.2d 536, 540 (Ind. Ct. App. 2011)
(holding that trial court properly dismissed complaint filed by plaintiff who was
involuntarily separated from his employment where, instead of submitting his
claim to the Department of Labor under the Wage Claims Statute, he filed suit
under the Wage Payment Statute), *trans. denied*.

[31] As this court explicitly stated *Lemon v. Wishard Health Services*, 902 N.E.2d 297,
300 (Ind. Ct. App. 2009), *trans. denied*, "the Wage Claims [Statute]
contemplates that a claimant must approach the [Department of Labor] *before*

---

[17] We note that a claim for unpaid wages under the Wage Claims Statute may include a claim for unpaid commissions. *See* Ind. Code § 22-2-9-1(b) ("The term 'wages' means all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or *commission basis*, or in any other method of calculating such amount.").

he or she is entitled to file a lawsuit in court to seek unpaid wages or penalties." (emphasis added). In *Lemon*, the named plaintiff met the exhaustion requirements of the Wage Claims Statute by submitting her claim to the Department of Labor before she filed suit. *Id*. at 301. In that case, however, the named plaintiff sought to convert her complaint into a class action. *Id*. The question before the *Lemon* court was "whether the act of seeking class certification somehow enables the putative class members to avoid compliance with the statute." *Id*. We answered this question in the negative. *See id*. at 301–02 ("we cannot conclude that the purpose of the Wage Claims [Statute] is satisfied by permitting a putative class representative's claim to act as a proxy for the claims of the putative class members.").

[32]     Still, the plaintiff in *Lemon* argued that even if putative class members needed a letter of referral from the Department of Labor to proceed with their respective claims, they could obtain those letters *after* the lawsuit was filed. *Id*. at 302. We flatly rejected this claim, noting that the plain language of the Wage Claims Statute "requires that the letter be obtained—and the administrative process followed—*before* the lawsuit is filed." *Id*. We agreed that obtaining permission to sue after the complaint had already been filed would be "the emptiest of gestures," and held that "to get the letter of referral *after* the fact would be to render the statute a nullity, which we cannot and will not do." *Id*. (emphasis added).

[33]     We are therefore compelled to agree with AmeriGlobe that the trial court erred in denying its motion for partial summary judgment on Althoff's claims under

the Wage Claims Statute. The Wage Claims Statute, as interpreted by our supreme court clearly requires that a complainant obtain the permission of the Department of Labor and/or Attorney General *before* filing suit under the Wage Claims Statute. And we held in *Lemon* that a plaintiff may not seek such permission *after* having already filed suit, which is precisely what the trial court permitted here.

[34] We also note that a two-year statute of limitations applies to claims made under the Wage Claims Statute. *Lemon*, 902 N.E.2d at 302 (citing Ind. Code § 34-11-2-1).[18] Althoff did not submit any claim with the Department of Labor until November 26, 2014. This is more than two years after August 11, 2011, when AmeriGlobe terminated Althoff's employment and the latest date his claim under the Wage Claims Statute could have accrued. Thus, even if Althoff could have cured his failure to exhaust his administrative remedies by submitting his claim to the Department of Labor after having already filed suit, he did not do so until after the applicable statute of limitations had expired.

[35] Althoff argues that a ten-year statute of limitations should apply because his claim was based on a written contract. *See* I.C. § 34-11-2-1 (excepting actions based on written contracts from two-year statute of limitations). Assuming Althoff's breach of contract claim may be based on a written contract, his claim

---

[18] Indiana Code section 34-11-2-1 provides, "An action relating to the terms, conditions, and privileges of employment except actions based upon a written contract (including, but not limited to, hiring or the failure to hire, suspension, discharge, discipline, promotion, demotion, retirement, wages, or salary) must be brought within two (2) years of the date of the act or omission complained of."

under the Wage Claims Statute is not. *See Lemon*, 902 N.E.2d at 302 (holding that claims under the Wage Claims Statute are subject to the two-year statute of limitations set forth in Indiana Code section § 34-11-2-1); *see also Reel v. Clarian Health Partners, Inc.*, 917 N.E.2d 714, 720 n.5 (Ind. Ct. App. 2009) (noting that claims under the Wage Claims Statute are subject to a two-year statute of limitations), *trans. denied.*[19]

[36] Because Althoff did not submit his claim under the Wage Claims Statute to the Department of Labor until after he had already filed suit, and well after the applicable statute of limitations had run, the trial court should have granted AmeriGlobe's motion for summary judgment on Althoff's claims under the Wage Claims Statute. We therefore reverse the trial court's judgment on Althoff's claim under the Wage Claims Statute.[20]

## II. Breach of Contract

[37] AmeriGlobe also argues that the trial court erred in granting judgment in favor of Althoff on his claim that AmeriGlobe breached its employment agreement

---

[19] Both parties agree that the written employment agreement embodied the terms of their agreement. However, this document was not signed by either party. In a "hypertechnical" sense, then, the terms of the parties' contract was an "oral adoption" of the terms stated in the written agreement. *See Knutson v. UGS Corp.*, 526 F.3d 339, 341 (7th Cir. 2008) (noting that where document titled "Compensation Program" contained no space for signatures and was unsigned, it was merely a statement of terms, and that the contract between the employer and employee was therefore "an oral adoption of the terms stated in" the written terms). But whether the contract between the parties here was written or oral does not alter our conclusion. The fact remains that his claim under the Wage Claims Statute is subject to a two-year statute of limitations.

[20] Because we conclude that the trial court erred in awarding damages under the Wage Claims Statute, we need not address AmeriGlobe's argument that the trial court further erred by awarding double damages without a finding of bad faith.

with Althoff.[21] When a trial court enters findings and conclusions pursuant to Indiana Trial Rule 52, we apply a two-tiered standard of review on appeal. *Anderson v. Ivy*, 955 N.E.2d 795, 800 (Ind. Ct. App. 2011), *trans. denied*. We first determine whether the evidence supports the findings. *Id*. Second, we determine whether the findings support the judgment. *Id*. "'In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment.'" *Id*. (quoting *Smith v. Smith*, 938 N.E.2d 857, 860 (Ind. Ct. App. 2010)). We do not reweigh the evidence, and we consider only the evidence favorable to the trial court's judgment. *Id*. The party appealing the trial court's judgment must establish that the findings are clearly erroneous. *Id*. Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them, and the trial court's judgment is clearly erroneous if it is unsupported by the findings and the conclusions which rely upon those findings. *Infinity Products, Inc. v. Quandt*, 810 N.E.2d 1028, 1031 (Ind. 2004). We do not defer to conclusions of law, which are evaluated *de novo. Anderson,* 955 N.E.2d at 800.

---

[21] Ameriglobe makes no argument that a claim under the Wage Claims Statute was Althoff's exclusive remedy. Even if it did, we are unable to find any authority to suggest that an employee plaintiff may not plead alternative theories of relief, i.e., both a claim under the Wage Claims Statute and a claim for breach of contract. To the contrary, our research has revealed cases in which plaintiffs brought claims for a breach of contract and under the Wage Claims Statute, and nothing in these cases suggests that this is impermissible or that a claim under the Wage Claims Statute is an exclusive remedy. *See e.g.*, *Sheaff Brock Inv. Advisors, LLC v. Morton*, 7 N.E.3d 278, 285 (Ind. Ct. App. 2014), *trans. denied*; *Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118, 1122 (7th Cir. 1998).

[38]	AmeriGlobe claims that because Althoff was an at-will employee, it could change the terms of his employment, including the commission rate, and if Althoff continued to work after being informed of this change in employment terms, he tacitly agreed to them. AmeriGlobe's position has support in case law.[22]

[39]	For example, in *Wheeler v. Balemaster*, 601 N.E.2d 447 (Ind. Ct. App. 1992), Wheeler, the employee, worked for the employer as a salesman. At the time he started, the employer had a written incentive plan which stated that commissions would be paid after shipment of the order. *Id.* at 448. Later, however, the employer altered the commission plan to make payment of commission contingent upon employment with the company; that is, it would not pay commission on a sale if the salesperson was not still employed with the company, even if that salesperson had made that particular sale. Wheeler objected to this change, but nevertheless continued to work for the employer until he resigned to run a competing business. Pursuant to its revised policy, the employer did not pay Wheeler for any commissions on orders that shipped after he left. Wheeler then filed a complaint to recover the unpaid commissions. The

---

[22] Althoff argues that AmeriGlobe waived this argument by failing to present it to the trial court. We disagree. Althoff admits that AmeriGlobe's argument before the trial court was that the written employment agreement "did not entitle Mr. Althoff to the same commission rate structure for Trap bag sales. . . and [that] Ameriglobe was free to change the commission rate." Appellee's Br. at 19. This is essentially the same argument AmeriGlobe presents on appeal. That AmeriGlobe did not cite to the same particular cases, or that it has cited new authority to support its position, is not fatal to its claim on appeal. *See Moryl v. Ransone*, 4 N.E.3d 1133, 1136 (Ind. 2014) ("Questions within the issues and before the trial court are before the appellate court, and new arguments and authorities may with strict propriety be brought forward.").

trial court granted summary judgment in favor of the employer. Wheeler appealed, but this court made short work of Wheeler's argument, writing:

> This Court has held that, when an employer unilaterally changes agreed-upon employment terms, the employee may either (1) accept the changes and continue employment under the new terms or (2) reject the changes and quit work. Although [Wheeler] objected to the revised incentive plan, he continued to work for Employer for over six months before voluntarily resigning; therefore, he must abide by the revised plan.

*Id.* (citing *Quillen v. Review Bd. of Ind. Emp't Security Div.*, 468 N.E.2d 238, 241 (Ind. Ct. App. 1984)).

[40] And in *Todd v. Stewart*, 566 N.E.2d 1077 (Ind. Ct. App. 1991), *trans. denied*, the plaintiff Todd was hired in 1983 by the defendant Stewart to work as a legal secretary for his law office and title insurance company. The parties originally agreed that Todd would be entitled to a bonus. But in May 1987, Stewart announced that he was cancelling the bonus agreement. Todd told Stewart that this was unacceptable but nevertheless continued to work for Stewart until July 1987, when he terminated her employment. Todd filed suit seeking damages, including for the unpaid bonus. On appeal, we held that the trial court did not err in denying recovery for the bonus after Stewart unilaterally cancelled it. *Id.* at 1079 (citing *Quillen*, 468 N.E.2d at 241). The court noted that, although Todd did not agree to, and in fact protested, the change, she continued to work for Stewart after he announced the change. She was therefore bound by the new terms of her employment. *Id.*; *see also Sweet v. Indianapolis Jet Ctr., Inc.,* 918 F.

Supp. 2d 801, 807 (S.D. Ind. 2013) (citing *Wheeler* for the proposition that, in the absence of an enforceable employment contract, the employer could change the terms of the employment and that when the employee was presented with a new salary, he could either accept it or resign).

[41] At first blush, these cases might appear to be distinguishable in that, here, there was a written employment agreement. However, that agreement was terminable at the discretion of either party. *See* Appellant's App. Vol. 2, p. 49 (term of employment was at the discretion of either AmeriGlobe or Althoff). Indeed, Althoff himself testified on direct examination by his own counsel that his employment was "at will," meaning "[t]hat I could quit. They could fire me." Tr. Vol. 2, p. 108. Thus, despite having written down the terms of Althoff's employment, Althoff was still an at-will employee. Accordingly, when AmeriGlobe informed Althoff that it was unilaterally changing the terms of his employment, i.e., that the commission rate for sales of the TrapBag would be a flat 4%, he had two choices under Indiana law: he could quit, or he could continue to work, thereby accepting the new terms of his employment. *Wheeler*, 601 N.E.2d at 448. Althoff admittedly chose the latter, as he testified on direct examination:

> Q. Now, after [Schnaars] told you that that's what he was going to pay you, in your mind, what choices did you have?
>
> A. I could quit. I could continue to work.
>
> Q. And did you continue to work?
>
> A. Yes, I did.

Tr. Vol. 2, p. 150.

[42] Thus, when Althoff continued to work after AmeriGlobe changed the terms of his employment, he effectively agreed to new terms of employment and he must abide by the revised terms. *Wheeler*, 601 N.E.2d at 448; *Todd*, 566 N.E.2d at 1077. These revised terms were a 4% flat commission on the sales of the TrapBag and the company standard commission on bulk bags. Althoff's claim that he is owed the company standard commission on sales of the TrapBag therefore fails.

[43] We note, however, that even under AmeriGlobe's unilaterally revised terms of a 4% commission on TrapBag sales, AmeriGlobe underpaid Althoff by $33,528.40. *See* notes 7, 9 *supra.* Accordingly, although the trial court erred as a matter of law in concluding that Althoff was entitled to the commission rate set forth in the written agreement, Althoff is entitled to $33,528.40, which represents the 4% commission that AmeriGlobe unilaterally changed and which Althoff agreed to by continuing to work for AmeriGlobe.[23] We therefore reverse the trial court's award of damages for breach of the employment agreement and remand for entry of judgment in favor of Althoff in the amount of $33,528.40.

---

[23] Absent some other arrangement, when an employer makes an agreement to provide compensation for services, the employers right to this compensation vests when the employee renders the service, and the employee is entitled to be compensated pursuant to the terms of employment in effect at the time the service was rendered. *Sheaff Brock*, 7 N.E.3d at 284 (citing *Highhouse v. Midwest Orthopedic Institute, P.C.*, 807 N.E.2d 737 (Ind. 2004); *Wells Fargo Ins., Inc. v. Land*, 932 N.E.2d 195, 200 (Ind. Ct. App. 2010)). Thus, Althoff was entitled to a 4% commission for sales of the TrapBag when he completed the sales transactions.

# Conclusion

The trial court erred by denying AmeriGlobe's motion for partial summary judgment on Althoff's claims under the Wage Claims Statute, as Althoff did not submit his wage claim to the Department of Labor and receive permission to file his claim before he filed suit against AmeriGlobe. Althoff's action of submitting his claim to the Department of Labor after he filed suit does not remedy his failure to do so before having filed suit. The trial court also erred as a matter of law in concluding that Althoff was entitled to the commission rate set forth in the written employment agreement. Because Althoff was admittedly an at-will employee, AmeriGlobe could unilaterally change the terms of Althoff's employment. When AmeriGlobe did so, Althoff had two options under Indiana law: quit, or continue to work under the new terms. By continuing to work for AmeriGlobe, Althoff effectively agreed to the new commission structure. Althoff is, however, entitled to $33,528.40, which represents the 4% commission rate that AmeriGlobe unilaterally imposed and to which Althoff agreed by continuing to work for AmeriGlobe. We therefore reverse the judgment of the trial court and remand for entry of judgment in favor of Althoff in the amount of $33,528.40.

Reversed and remanded.

Najam, J., and Barnes, J., concur.